## CITY OF BEAUMONT et al. v. PRIDDIE et al.

Motion No. 7588; No. 7929.

Court of Civil Appeals of Texas. Austin.
July 26, 1933.

Rehearing Denied Oct. 4, 1933.

rying out a contract between the city and the railroad (Texas & New Orleans Railroad Company) providing for separation of the grades of the railroad's tracks from those of the city's streets; and (2) from issuing bonds in furtherance of the contract.

The bond issue which had been authorized by an election held for that purpose was in the sum of $900,000, the approximate amount (in part fixed and in part estimated) of the obligations (other than damages) which the city assumed under the contract, the items of which were:

(1) A storm sewer necessary to drain underpasses for city streets, estimated to cost $40,000.

(2) Certain rights of way for street purposes (new streets and widening existing ones) over the railroad's property, for which the city was to pay the railroad $384,500, plus the cost (estimated at $42,500) of acquiring and clearing of buildings two strips of land; and the agreed value ($7,500) of another strip of land owned by the railroad, and damage to building thereon, necessary to widen the railroad right of way in accordance with the grade separating plan. This item included damage to the railroad's buildings, etc.

(3) The city was to pay the railroad $194,063, the agreed amount of one-half the cost of underpasses provided for in the contract. This item included one-half the cost of a viaduct at Mariposa street crossing.

(4) The city was to pay one-half of any recovery by property owners on account of property damage.

(5) The city was to cause the removal and reconstruction of tracks, poles, wires, pipe lines, etc., of public service companies, estimated at $35,000. Other items obligatory upon the city included the cost of paving, constructing sidewalks, and acquisition of property for street widening purposes.

The contract was embodied in an ordinance regularly passed, and was contingent upon the carrying of the bond election, which resulted as already stated.

The items covering acquisition of additional right of way for the railroad, the city's contribution to the cost of underpasses, removal of utility companies' instrumentalities, construction of sewer, and assumption of property damage, are attacked as ultra vires the city's powers both under the Constitution and the city charter. The sewer construction obligation is further attacked as not being within the purpose of the bond election ordinance. The entire contract and various items therein are attacked as a fraudulent and arbitrary abuse of the city's discretionary powers.

The following general statement will suffice, we think, to a clear understanding of what we regard the controlling issues presented by the appeal:

Steve M. King, City Atty., Jno. D. Rienstra, Asst. City Atty., and Duff & Cecil, all of Beaumont, for appellants.

Howth, Adams & Hart, Gordon, Lawhon, Davidson & Sharfstein, J. L. C. McFaddin, and Sonfield & Sonfield, all of Beaumont, for appellees.

McCLENDON, Chief Justice.

Appeal from a final judgment upon a special issue verdict, enjoining the city of Beaumont and its governing officials (1) from car-

The railroad right of way extends across the city from east to west, dividing the city territorially and as to its business and residential districts into two approximately equal portions. The eastern boundary of the city is coincident with the west bank of the Neches river, navigable at this point to ocean-going vessels, and crossed by the railroad's bridge. Beginning at this bridge and proceeding west, the railroad tracks are crossed at grade by five streets in the following order: Cypress, Travis, Main, Pearl, and Orleans; the four latter of which are in the heart of the business district and are the most heavily traveled streets in the city. The railroad's yards extend from Orleans to Fourth street, a distance of about one mile, between which there are no street crossings of any kind, except at Mariposa street, at which the railroad tracks are crossed by means of a viaduct (overpass). This viaduct connects the two residence portions of the city, and is the most heavily traveled street in the residence district. A portion of the industrial district is adjacent to and on both sides of the railroad right of way between Orleans and Mariposa streets. Some of the largest industries in and adjacent to the city are along the river water front north of the railroad's bridge.

Beaumont is a city of some 60,000 inhabitants and the situation, as above outlined, was recognized by the city and railroad and shown by undisputed testimony to be virtually intolerable, due to the danger to life and property and blocking of traffic on heavily traveled business streets, the increased fire hazard incident to impeding the passage of the city's fire-fighting instrumentalities between the two portions of the city, and the absence of any street crossing between Orleans and Mariposa streets. Abating the grade crossings and of opening other streets west of Orleans was recited as a necessity in the contract between the city and the railroad.

This necessity had been generally recognized for many years, and about the year 1917 a movement began looking to remedying the evil, resulting in a contract in 1924 known as the Ash plan. Nothing, however, was done under this contract; and in December, 1927, as the result of activity on the part of the Beaumont Chamber of Commerce and other civic organizations, a committee of prominent citizens, headed by J. F. Weed, and known as the committee of seven, was created to study the problem and devise and recommend a plan for its solution. This committee employed an engineer, and, after careful study of the entire problem, and numerous conferences and negotiations with the railroad's executive and engineering officials, an agreement was reached, the terms of which were embodied in a report of the committee of seven to the mayor and commission of Beaumont, which was dated July 7, 1930. This report reviewed in great detail the work of the committee and

its negotiations with the railroad; and set forth with much particularity the details of the proposed plan. The entire cost was estimated at about $4,000,000, and the cost to the city at less than $900,000. However, the report reads: "The city is to pay only about $233,000.00 towards the actual cost of the work proposed; the remainder of the city's expense is due to purchase of land for opening and widening and paving streets and paying for damages to buildings for such street openings and widening and for sewerage."

Speaking generally, the plan contemplated raising the railroad grade to accommodate a double track beginning at Fourth street, and proceeding eastward to the city limits, where a double track lift bridge of bascule type was to be constructed by the railroad across the Neches river. This also necessitated raising the railroad grade for some distance east of the river. Underpasses were to be constructed at the five street crossings, Cypress to Orleans, and at five additional streets to be opened west of Orleans, the right of way for the latter to be acquired by purchase from the railroad. The Mariposa viaduct was to be reconstructed and elevated so as to provide the necessary clearance incident to raised railroad grade. The city was to construct and own a storm sewer from Fourth street to the river, the railroad granting an easement along its right of way for that purpose. The railroad yards were to be moved to a tract just west of the city limits, which the railroad had acquired for that purpose. The railroad retained, however, its tracks in the old yards, and reserved trackage rights over the new streets the city was acquiring from the railroad.

The cost of the city's obligations, fixed and estimated, is given in a letter of March 27, 1930, by the committee of seven to Mr. Waide (vice president of the Southern Pacific Lines); the items of which read:

1. Pay to the Southern Pacific Co., in cash, or its equivalent in city bonds, for street right of way and damages the following:

| | |
|---|---|
| Right of way, R. R. Avenue to Center Street | $ 26,000.00 |
| Right of way, Jefferson to Magnolia | 24,000.00 |
| Right of way, Park to Laurel | 38,000.00 |
| Right of way, Laurel, from Park to Orleans | 25,000.00 |
| Right of way, Crockett, west of Pearl Street Triangle | 15,000.00 |
| Right of way, Sunset Park (20' x 300') | 50,000.00 |
| Total for Right of Way | $178,000.00 |
| For damages to Round House, Freight House and sheds and all other small buildings and property belonging to S. P. Co., in their yards | 175,000.00 |
| Total to Southern Pacific Company | $353,000.00 |

2. The City to pay cost of land and damage for extra right of way, needed for main Elevated Structure,

| | |
|---|---|
| (a) Between Main and Pearl, estimated | 7,500.00 |
| (b) Oil Well Supply Co. lot, estimated | 35,000.00 |
| (c) Crystal Ice Co., Cypress & Travis Sts. | 7,500.00 |
| Total this item | $ 50,000.00 |

The City to pay this item, be it more or less than the estimates.

3. City to pay other Right of Way damages for Street widening, estimated as follows:

| | |
|---|---|
| Lot 7, Block 32, estimated | $ 5,000.00 |
| Lot 7, Block 29, estimated | 6,000.00 |
| Gordon-Sewall Building, estimated | 30,000.00 |
| Widening Laurel 20 ft. off lots 7 and 8 and triangle off Lot 9, Block 19 | 30,000.00 |
| Widening Laurel 20 ft. off Block 20 | 50,000.00 |
| **Total this item** | **$121,000.00** |

The City to pay this item, be it more or less than estimated.

4. City to build and pay for,

| | |
|---|---|
| (a) Drain Sewer, Center to River | 40,000.00 |
| (b) All paving, estimated | 110,000.00 |
| (c) Relaying Street Car Tracks | 35,000.00 |
| **Total this item** | **$185,000.00** |

The City to pay this item, be it more or less than estimated.

5. City to pay Southern Pacific Company one-half of estimated cost of Mariposa Viaduct and underpasses—Sou. Pac. to build same including the retaining walls necessary to protect streets on either side of underpasses, as revised 3—18—'30 ... $171,267.00

| | |
|---|---|
| Add for underpass changes at Main, Pearl, Orleans and Park of date 3—19—'30 | 12,000.00 |
| **Total this item** | **$183,267.00** |

This item to be fixed, as above estimated, whether the cost be more or less.

| | |
|---|---|
| **Total estimated cost to the city** | **$892,267.00** |

Upon the filing of this report the committee of seven was continued; and the contract was finally drafted and approved by the railroad, and by the city by ordinance dated June 9, 1931. The only changes which the final draft of contract made in the report of the committee of seven were:

. (1) An additional underpass was provided for at Archer street which added (a) $10,063 to the city's half of construction cost of underpasses, raising that item from $183,267 to $194,063; and (b) $24,000 to the cost of right of way for street crossings.

(2) Item 2 (a) ($7,500) in the report was shifted to item 1 of the report (street right of way and damages), which, plus the $24,000 Archer street right of way, increased item 1 (subsection [c] of section 3 of the contract) from $353,000 to $384,500.

(3) Items 2 (b) and 2 (c) of the report were shifted to item 1 as additional cost of right of way and damages, the contract providing that the railroad was to acquire the two strips of land necessary to widen its right of way, and the city would reimburse the railroad for the cost thereof, including 5 per cent. per annum on any sum the railroad might be required to deposit under condemnation proceedings, plus the cost of clearing the property of buildings; said amount, the contract reads, "shall be added to the sum stated in sub-section (c) of this section, as a part of the consideration to be paid by the city for the rights of way described in said sub-section (c) hereof."

The strip of land in item 2 (a) of the report was covered by a building and belonged to the railroad. It was essential to widening the railroad right of way at that point. The shifting of this item and items 2 (b) and 2 (c) to item 1 of the report (subsection [c] of section 3 of the contract) was at the instance of the city's legal department, it being deemed doubtful whether the city had the power to acquire property for railroad right of way purposes.

The jury findings were that:

(1) $80,000 was the reasonable value on June 9, 1931 (date of the contract) of rights of way for street purposes over railroad's property required by extension of the four new streets.

(2) $90,000 was the damage to the railroad's buildings and other improvements occasioned by such extensions.

(3) $107,453 was the reasonable value on said date for railroad purposes only of the land embraced in the railroad's switchyards and engine terminals.

(4) $243,837.50 was the value of said property for other purposes (industrial, etc.), if abandoned for railroad purposes.

(5) The agreement to pay the cost of items 2 (b) and 2 (c) of the committee's report was not in fact a donation by the city to the railroad towards the viaduct structure.

(6) $163,000 was the reasonable cost of constructing the proposed viaduct and underpasses.

We will first consider the power of the city to contribute to the cost of constructing the viaduct and underpasses.

It is of course elementary that the powers of a municipal corporation are limited to those expressly granted; those necessarily or reasonably implied in or incident to those expressly granted; and those essential to the declared objects of the corporation. Foster v. Waco, 113 Tex. 352, 255 S. W. 1104. These powers are derived from and are limited by the Constitution, the statutes, and the city charter.

. Appellees urge that the city's contribution to this construction comes within the inhibitions of article 11, § 3, of the Constitution, which reads: "No county, city, or other municipal corporation shall hereafter become a subscriber to the capital of any private corporation or association, or make any appropriation or donation to the same, or in anywise loan its credit; but this shall not be construed to in any way effect any obligation heretofore undertaken pursuant to law."

The point urged is that, since the city, both by express charter stipulation, as well as generally, has the authority, where the necessity exists, to compel the railroad to bear the entire cost of grade separation, the agreement of the city to contribute to that cost constituted a donation within the purview of the quoted provision.

■ It is now quite generally held that the state, under its police power, may compel a railroad company at its own cost to eliminate grade crossings at public highways, where necessary in the interest of public safety. The authorities upon this subject are numerous, and we shall only refer to case notes in 62 A. L. R. page 815 et seq.; 55 A. L. R. page 660 et seq., for their collation and digest.

In the leading case of Erie R. R. Co. v. Board of Public Utility Comr's, 254 U. S. 394, 41 S. Ct. 169, 171, 65 L. Ed. 322, Mr. Justice Holmes, writing for the Supreme Court of the United States, thus epitomizes the holdings upon this subject:

"The extent of the States' [police] power varies in different cases from absolute to qualified, somewhat as the privilege in respect of inflicting pecuniary damage varies. The power of the State over grade crossings derives little light from cases on the power to regulate trains.

"Grade crossings call for a necessary adjustment of two conflicting interests—that of the public using the streets and that of the railroads and the public using them. Generically the streets represent the more important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited and that it necessarily frequents, the State, in the care of which this interest is, and from which, ultimately, the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. It is said that if the same requirement were made for the other grade crossings of the road it would soon be bankrupt. That the States might be so foolish as to kill a goose that lays golden eggs for them, has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil. Denver & R. G. R. Co. v. Denver, 250 U. S. 241, 246, 63 L. Ed. 958, 962, 39 S. Ct. 450. To engage in interstate commerce the railroad must get on to the land and to get on to it must comply with the conditions imposed by the State for the safety of its citizens. Contracts made by the road are made subject to the possible exercise of the sovereign right. Denver & R. G. R. Co. v. Denver, 250 U. S. 241, 244, 63 L. Ed. 958, 961, 39 S. Ct. 450; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 372, 63 L. Ed. 309 [9 A. L. R. 1420, P. U. R. 1919C, 60], 39 S. Ct. 117; Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, 31 S. Ct. 265; Northern P. R. Co. v. Minnesota, 208 U. S. 583, 52 L. Ed. 630, 28 S. Ct. 341; Manigault v. Springs, 199 U. S. 473, 480, 50 L. Ed. 274, 278, 26 S. Ct. 127. If the burdens imposed are so great that the road cannot be run at a profit it can stop, whatever the misfortunes the stopping may produce. Brooks-Scanlon Co. v. Railroad Commission, 251 U. S. 396, 64 L. Ed. 323 [P. U. R. 1920C, 579], 40 S. Ct. 183. Intelligent self-interest should lead to a careful consideration of what the road is able to do without ruin, but this is not a constitutional duty."

While the exact question (grade separation) does not seem to have arisen in this state, the holdings in grade crossing cases generally involve the identical principle, and bring our decisions in line with those of other jurisdictions. Gulf, C. & S. F. Ry. v. Milam County, 90 Tex. 355, 38 S. W. 747; Gulf, C. & S. F. Ry. v. Rowland, 70 Tex. 298, 7 S. W. 718. As was said in State of Minn. v. St. Paul, M. & M. Ry. Co., 98 Minn. 380, 108 N. W. 261, 266, 28 L. R. A. (N. S.) 298, 120 Am. St. Rep. 581, 8 Ann. Cas. 1047 (affirmed by U. S. Sup. Ct., 214 U. S. 497, 29 S. Ct. 698, 53 L. Ed. 1060): "There can be no difference on principle, in so far as an exercise of the police power is concerned, between a grade crossing and a bridge over the tracks. The difference between the two is one of degree, relating solely to the matter of expense. But the expense incident to a compliance with police regulations is not an element of consideration, except, perhaps, where arbitrary and unreasonable, or resulting in a practical confiscation of property. Cases where one railroad crosses another have no application, because both stand on an equality respecting rights and obligations, while in cases like that at bar the rights of the public are superior."

In Lehigh Valley R. R. Co. v. Board of Public Utility Commissioners, 278 U. S. 24, 49 S. Ct. 69, 73 L. Ed. 161, 62 A. L. R. 805, it was held that: "The Transportation Act of 1920 did not take from the states and thrust upon the Interstate Commerce Commission investigation into parochial matters like the elimination of railroad grade crossings of highways, unless by reason of their effect upon economical management and service of the railroads their general bearing is clear."

■ By the great weight of authority, although there is respectable authority contra, this police power of the state is in no way affected by the fact that the road was opened

after the railroad was built. Rowland, Milam County, and Minnesota Cases above; Houston & T. C. Ry. v. Dallas, 98 Tex. 413, 84 S. W. 648, 70 L. R. A. 850; Houston & T. C. Ry. v. Houston (Tex. Civ. App.) 41 S.W.(2d) 352; also case note in 28 L. R. A. (N. S.) page 298 et seq. The Minnesota Case contains quite an elaborate review of the authorities.

██ This power is subject to the rule applicable generally to the police power, that it must be reasonably exercised; and the question of reasonableness is always open to judicial review. Houston & T. C. Ry. v. Dallas, and Lehigh Valley Cases above. We read from the opinion by Mr. Chief Justice Taft in the latter case: "We emphasize this, not because there is doubt about it, but because we deprecate the impression, apparently entertained by some, that in the safeguarding of railroad crossings by order of state or local authority the exercise of police power escapes the ordinary constitutional limitation of reasonableness of cost. This is apt to give to local boards a sense of freedom which tempts to arbitrariness and extravagance. The case before us is one which is near the line of reasonableness, but for the reasons given we think it does not go beyond the line."

██ But, although the state may compel the railroad to bear the entire expense of grade separation, nevertheless it is not required to do so, but may bear the entire expense itself, or apportion it between itself and the railroad. While this power is generally recognized, the cases in which it has been challenged as violative of constitutional provisions similar to those in this state inhibiting the state or its subdivisions from making donations to private corporations or individuals appear to be rare. Those in which the question has been considered uniformly hold that state or municipal contribution to the expense does not come within such inhibition. Lehigh Valley Ry. v. Canal Board, 204 N. Y. 471, 97 N. E. 964, Ann. Cas. 1913C, 1228; Brooke v. Philadelphia, 162 Pa. 123, 29 A. 387, 24 L. R. A. 781. We think the soundness of this holding cannot seriously be questioned. While the paramount duty rests upon the railroad to provide originally and thereafter to maintain the safety of the crossing, regardless of the requirements in that regard brought about by changes in conditions, still the interest therein of the state as representative of the public is such that the expenditure of public funds in this regard is a legitimate governmental function, and does not properly fall within the designation of a donation of public funds to a private enterprise. In the infinite variety of situations which present themselves, the state may properly make an adjustment of the expense, as the peculiar equities of each situation may in its judgment dictate. In this matter the judgment of the state is supreme, subject to judicial review only in case of fraudulent or arbitrary abuse of power.

██ The above-discussed police powers of the state may be delegated to municipal corporations or other agencies; and the authorities generally hold that such delegation is necessarily implied in conferring upon municipalities the exclusive dominion over the public streets within their boundaries. For authorities see case notes in 35 A. L. R. page 1322 et seq., and 36 A. L. R. page 1122 et seq.

This brings us to a consideration of the powers in this regard which are conferred upon the city of Beaumont by the Constitution, by the Legislature, and by the city charter.

Beaumont is a home rule city, and some significance may be attached to the fact that its charter, the pertinent provisions of which are quoted below, was adopted by the people in 1919, some two years after the agitation for grade separation.

██ The home rule amendment (section 5, art. 11) empowers cities of over 5000 inhabitants "by a majority vote of the qualified voters of said city, at an election held for that purpose, [to] adopt or amend their charters, subject to such limitations as may be prescribed by the Legislature."

It is to be noted that the statutes relating to home rule cities in some instances confer powers upon such cities generally, and in others confer powers upon their governing boards. As to the latter it is held that charter provisions, adopted under the amendment, cannot take from, or otherwise affect, the powers of the governing board in such regards. McCutcheon v. Wozencraft, 116 Tex. 440, 294 S. W. 1105.

██ There is no specific legislation upon the subject of grade separation in home rule or other cities. The power of municipalities in this regard is derived, in so far as the statutes are concerned, from those provisions which confer upon such cities "exclusive dominion, control, and jurisdiction in, over and under the public streets, avenues, alleys, highways and boulevards * * * of such city" (R. C. S. art. 1175, subd. 16), with the power to improve same generally, and in various specified respects. Subdivisions 17 and 18 of article 1175, R. C. S. These powers are conferred upon the cities and not upon their governing boards. The apportionment of costs in case of abutting owners is required to be prescribed by charter. Id. subd. 17.

While we think it clear that such cities cannot by charter denude themselves of the powers conferred and the obligations imposed by these provisions, they have the power, through charter adoption, to prescribe the conditions, limitations, and restrictions under which, and the manner, plan, and method by

which, these powers may be exercised by their governing boards.

The pertinent provisions of the Beaumont charter read:

"The City of Beaumont shall have power, when in the judgment of the Commission it is necessary, to avoid congestion of traffic or safeguard the public interest, to require any railroad company operating any track or tracks upon or across any public streets of the City of Beaumont, to reduce such track or tracks below or elevate the same above the level of such street or streets, or relocate or detour their track or tracks, and to require the company or companies owning or operating such track or tracks, to provide necessary and proper crossings for the public travel at intersecting streets; all such work to be done in the manner required by the City Commission, at the expense of such railroad company or companies; provided, that before acting under this subsection a public hearing shall be first held by the Commission and thirty days' notice given such company or companies; and the City Commission is hereby authorized and empowered to enact and enforce ordinances providing suitable penalties for failure on the part of any railroad company to comply with its requirements with reference to lowering, elevating, relocating or detouring its tracks as aforesaid; and the City Commission is further authorized and empowered if in its judgment the facts warrant it, to declare any railroad track or tracks now existing or hereafter existing in said City of Beaumont, no matter under what authority or right they may so exist, a public nuisance, and may require same to be abated by the railroad company or companies owning or operating the same without expense to the City of Beaumont, and may enact and enforce all ordinances prescribing suitable penalties for failure so to abate such nuisance, and further said City Commission shall be authorized and empowered in the event of failure to comply with its requirements and orders under this section, to proceed to abate such nuisance by lowering, elevating, relocating or detouring such track or tracks or causing the same to be done, the expense whereof shall be chargeable to and borne by such railroad company or companies owning or operating such track or tracks, and shall be recoverable by the City of Beaumont in any court of competent jurisdiction.

"The provisions of this section are intended to be cumulative of all other lawful modes which now exist or may hereafter exist with reference to requiring any railroad company to lower, elevate, relocate or detour its track or tracks."

We have found but two jurisdictions (Wisconsin and Tennessee) in which similar charter provisions have been construed. City of Superior v. Roemer, 154 Wis. 345, 141 N. W. 250, 253; Application of Kaiser, 171 Wis. 40, 174 N. W. 714, 176 N. W. 781; Knoxville Ice & Cold Storage Co. v. City of Knoxville, 153 Tenn. 536, 284 S. W. 866, 873.

The Wisconsin cases hold that the power granted "to require railroad companies to construct and maintain at their own expense, such bridges, gates, viaducts, tunnels, approaches or other conveniences at all public crossings of streets, now laid out, or which may be hereafter laid out, as may be necessary," was exclusive; and: "This provision amounts to a prohibition. Where the charter provides for building at the expense of the railway companies, and no other authority is conferred, the city cannot authorize building in the manner prescribed at the city's expense. It could not by indirection defeat the provisions of the charter."

In the Tennessee case a similar provision was held not to be exclusive, and the city was accorded the power to contribute to the cost of a viaduct over the railroad's tracks. We read from the opinion: "No case has been cited, and we are not aware of any, wherein it has been held that a municipality has no choice in the matter of building a viaduct and can make no contribution to or pay the entire cost of the viaduct if it sees proper to do so, and we think its power and authority to do so cannot be questioned when it is a public purpose and in the interest of the public."

No cases are cited in support of this holding; and it is to be noted that the decision was rendered in 1926 some seven years later than the Kaiser Case and thirteen years later than the Roemer Case.

The question presented is not free from doubt, but we have reached the conclusion that the holding in the Wisconsin cases is sound. It is an elementary canon of construction of all written documents that every word therein is presumed to have been deliberately employed for some purpose, and this purpose, when ascertained, must be given effect. If the words in the charter: "All such work to be done * * * at the expense of such railroad company or companies," had been entirely eliminated, the city would have the same power to assess the entire cost against the railroad as it has with the words included. The inclusion of the words was therefore supererogatory and purposeless if they were not intended to be exclusive and to require in all cases that the expense be exclusively that of the railroad, and not that of the city either in whole or in part. If it had been the purpose to give the city discretionary power to share the expense with the railroad, it would have been a simple matter to so state in the charter. The maxim: "The inclusion of one is the exclusion of another," which is corollary to the above canon, would seem to apply here with all its force. The question presented is simply one of the construction of plain and unequivocal language,

and further elaboration of argument and citation of authorities would be superfluous.

But, contend appellants, the last paragraph of the quoted charter section making the provisions of the section "cumulative of all lawful· modes which now exist or may hereafter exist with reference to requiring any railroad company to lower, elevate, relocate, or detour its tracks," authorized the city by contract with the railroad (a lawful mode) to share the expense of the structure. We think, however, that the word "modes" in the expression "lawful modes * * * to requiring," has reference to modes of procedure and not to allocating the expense. We are impelled to this conclusion by the following considerations:

It may be conceded that the city could by contract do what it was authorized to do by ordinance. Now, let us suppose that the city and the railroad were unable to reach any agreement upon the subject, although the city had reached the conclusion that the plan recommended by the committee of seven was fair and just alike to the city and railroad, and the city, in all fairness, justice, and equity, should assume the burdens provided in the report. Is there any valid reason for according to the city the right to assume those burdens by contract, and deny it the power to assume them by ordinance under the mode of procedure prescribed in the quoted charter section? We can see none. Yet this would be the necessary result of appellants' construction of the last paragraph of the section; since, if "lawful mode to require" includes in the one instance the allocation of cost, it includes it in the other. Mandamus is a well-recognized "mode of requiring" a railroad to comply with its duty in this respect. If the city should deem it advisable to adopt this mode instead of that prescribed in the charter, it would be free, under appellants' contention, to assume a part of the cost, whereas, if it followed the charter prescribed mode, the entire expense must be that of the railroad. And this, although the equitable considerations would be the same under either mode.

"Mode of requiring" the railroad to do a particular thing would ordinarily mean that the railroad should do it at its own expense. This is the construction our Supreme Court has given to our statute imposing upon railroads the duty of providing and maintaining safe public road crossings generally (Milam County Case, above); and we think it was the intention of the charter provision to require the railroad to perform the work and bear the entire cost, whether the mode employed for its requirement be that prescribed in the charter or some other "legal mode of requiring" it, then existing or thereafter provided. The charter provision we believe is not a usual one, and its adoption as already noted some two years after the grade crossing problem had become so acute as to bring about public agitation for its solution lends color, if need be, to the conclusions we have reached.

While we are clear in the view that the city's contribution to the cost of underpasses and viaduct do not come within the constitutional inhibitions against donations to railroads or other private enterprises, it is by no means equally clear that the items (2[a], 2[b], and 2[c] in the report) covering the cost of additional railroad right of way do not come within those inhibitions. Two of these items were for real estate, the title to which was to be acquired by the railroad for right of way purposes, which, when acquired, would constitute a part of the railroad's permanent capital investment. The remaining item (2 [a]) was the agreed value of land and a building thereon, then owned by the railroad, the use of which was to be changed to railroad right of way purposes. The power of the city to use its funds for these purposes was regarded by the city's legal department as of such grave doubt that these items were shifted to item 1 of the report as additional compensation for the already agreed price of land which the city was acquiring from the railroad for street purposes. This was manifestly a subterfuge. The record shows that the entire negotiations leading up to and including acceptance of the proposal by the railroad were conducted on the city's behalf entirely by the committee of seven. Whether the committee had any official recognition by the city prior to its report to the mayor and commissioners, the record is not entirely clear. The city authorities were undoubtedly aware of the committee's appointment and activities from the beginning, and formal official recognition was given the committee by its continuance when its report was received. The report formed, not merely the general basis of the contract, but in every respect, other than as to the addition of the Archer street underpass, was carried forward into the contract, the further negotiations being confined to legal details. Every item in the report, as to amount and otherwise, was carried forward in the contract. It is clear, we think, that items 2(a), 2(b), and 2(c) cannot, under any fair interpretation of the record, be regarded or treated as a part of the consideration for street right of way. Whether these items come within the constitutional inhibitions against donations we find it unnecessary to decide, since we are clearly of the view that the proposal submitted in the bond election did not embrace them—a question we will now discuss.

In the bond election ordinance and in the proposal submitted to the electorate the purpose for which the bonds were to be issued was worded: " * * * For the purpose of opening, widening, extending, altering, repairing, paving, and improving streets and

highways in said city, including the construction of underpasses necessary and incidental to the making of said improvements and the purchase or acquisition of lands therefor in and for the city of Beaumont."

It can hardly be said that the acquisition of land to be used for widening the railroad right of way comes in any sense, even remotely, within any of the language quoted. It clearly would not ordinarily be regarded as a street improvement, nor was it in any sense a purchase or acquisition of land "for the city of Beaumont."

Our statutes governing city bond elections require that "the proposition to be submitted shall distinctly specify," among other things, "the purpose for which the bonds are to be issued." R. C. S. art. 703.

This is the general rule in such matters. 5 McQuillin on Mun. Corp. (2d Ed.) § 2357. It is also the general rule that the "question submitted to the people for their vote must not be misleading." Id.

Both of these rules were violated by the failure of the bond ordinance and proposal to specify distinctly or otherwise the acquisition of this land; and by the arbitrary allocation in the contract of the cost thereof to additional consideration for land to be acquired by the city for street purposes.

Ordinarily, the bond election would not be invalidated as to the specified purposes by failure to include this item. But here the entire purpose of the election was to enable the city to carry out its contract with the railroad, although the contract is not adverted to in the election ordinance. The contract expressly provided that it was contingent upon the carrying of a bond election by means of which the city was to acquire the funds with which to discharge the obligations it assumed. The contract in this regard was not severable, and the railroad would not be bound unless the city carried out this provision, and provided itself with the means to that end through a bond election. The exclusion of these items would therefore render the contract and with it the bond issue ineffectual.

Appellee's contention that the storm sewer item is not included in the bond election ordinance and proposal to the electorate is rested in the main upon the holding in Dallas Consol. Elec. St. Ry. Co. v. City of Dallas (Tex. Com. App.) 260 S. W. 1034, 1036. In that case it was held that a charter provision requiring a street railroad to pay the cost of the portion of street improvement "between the rails and track and for two feet on each side of the rails," did not warrant assessing the cost of that portion of a storm sewer lying between the stated boundaries. The opinion recognized that "under some laws and under certain conditions, a storm sewer may be considered as a part of street

improvements;" but it was held not to be within the intention of the charter provision. And this seems to be the general rule for construing ordinances and notices to property owners, where the improvement is taxed as a special assessment. Peck v. Grand Rapids, 125 Mich. 416, 84 N. W. 614; Lichtenwalter v. Akron, 25 Ohio App. 108, 158 N. E. 651. See, also, 5 McQuillin on Mun. Corp. (2d Ed.) § 2032. These decisions rest upon the proposition that the owner is entitled to know the specific character of the improvement the cost of which is to incumber his property, in order that he may intelligently determine the benefits vel non thereof.

But a somewhat different situation is presented in a bond election; details being wholly unessential and much less particularity being required. The streets of a city include not only the surface, but sufficient above and below the surface for all proper street purposes. 4 McQuillin on Mun. Corp. (2d Ed.) § 1385. Consequently the grant of an easement for street purposes, the delegation of police power over the streets, include, when not otherwise restricted, every legitimate purpose for which a public street may be used. Proper drainage is incident to street improvement, and in its general and broadest sense "street improvement" would without doubt include a storm sewer. The question here is the expression's meaning in the particular connection in which it is employed. "Improvement" is a relative term, and the sense in which it is used must always be gathered from the context. The ordinary interpretation of "street improvement" in the ordinance and proposal, following as it does the specific "street improvements" of widening, extending, altering, repairing, paving, and followed by the inclusion of underpasses and acquisition of land, would be that it was intended to include only improvements incidental to those specified or others ejusdem generis. The electorate are entitled to a fair and "distinctly specific" statement of the purposes for which the bonds are to be issued; and there is much force in the contention that as to this separate and important item the ordinance and proposal do not meet this test. Under our other holdings, however, it is not essential to adjudicate the point.

The question of the city's power to bear half the cost of property damage we think is eliminated under the following proposition in the joint brief filed by the city and railroad: "The damage, if any, being payable upon agreement by the City of Beaumont, occasioned by the conversion of ground level tracks to the elevated position and the operation of trains thereon, and damages, if any, occasioned by the change of street grades, being speculative, problematical and in futuro, and the City of Beaumont, in agreeing by said contract to pay said damages, the appellees' objection thereto to the effect that the pay-

ment of said damages will be a diversion of the proceeds of said bond issue, is unjustified and premature in that said appellees have an adequate remedy to restrain such action on the part of the City of Beaumont, when, if ever, the City of Beaumont attempts to pay said damages from the proceeds of said bond issue."

This proposition is tantamount to the assertion by the railroad, as well as the city, that this provision is severable from the other portions of the contract, and its validity may be brought in question and determined if and when its enforcement should ever be sought.

 We see no merit in appellees' contention that the obligation of the city to "remove or relocate, or cause to be removed or relocated, without cost to the Railroad Company," all railroad tracks, etc., is invalid. The city had the unquestioned power to cause this removal by the various utilities owning the instrumentalities, and this obligation could be literally fulfilled by the exercise of that power.

Additionally, the record shows that the owners of the affected tracks, the removal of which constituted the bulk of this item, had filed agreements with the city to perform this work. The other items (removal of poles, etc.) were inconsequential.

 We do not think there is substantial merit in appellees' contention that the city's contribution to the cost of underpasses comes within the charter provisions regulating the construction of public improvements as regards competitive bids. The underpasses were an integral part of the grade-raising structure, which was not being constructed by the city, but by the railroad. If the city had the power to contribute to the cost of this portion of the structure, it had the power, we think, to make the contribution in this manner. These charter provisions we believe inept to this situation. Appellants have elaborately briefed the point, but we think it unnecessary to incumber this opinion with its detailed discussion.

 We have carefully examined the record upon the issue of fraudulent and arbitrary abuse of discretionary power on the city's part. The contentions of appellees in this regard are predicated upon the wide discrepancy between the agreed cost of the underpasses and value of the street rights of way which the city was acquiring from the railroad and the jury findings of reasonable cost and value of those items. The negotiations between the committee of seven and the railroad covered a period of several years. The committee was composed of able, representative citizens, whose integrity was above question and whose interest was single to that of the city. They were men of wide practical experience, and had the benefit of expert advice upon all incident technical sub-

jects. The record is wholly lacking in any suggestion of fraud or bad faith in arriving at the amounts of these items. The evidence upon the issues of cost and value was widely variant; and the most that can be said of it in this respect would be that the committee might have made a bad bargain with the railroad. The evidence was not sufficient, we think, to sustain the finding of arbitrary abuse of discretion on the city's part. The applicable rule is that the judgment of a jury cannot be substituted for that of the city commission in matters of discretion, and only in cases where such discretion is arbitrarily abused as having no reasonable basis in the evidence is it subject to judicial review. See Johnson v. Ferguson (Tex. Civ. App.) 55 S.W.(2d) 153; Id. (Tex. Civ. App.) 57 S.W. (2d) 372; Railroad Com. v. Shupee (Tex. Civ. App.) 57 S.W.(2d) 295; City of San Antonio v. Fetzer (Tex. Civ. App.) 241 S. W. 1034.

The trial court's judgment is affirmed.

Affirmed.

On Appellants' Motion for Rehearing.

Upon the question of our construction of the Beaumont charter, appellants, citing the case of Schmidt v. Milwaukee, 149 Wis. 367, 135 N. W. 883, 888, say: "Strange as it may seem, this opinion is rendered by the Wisconsin Supreme Court and reaches a contrary conclusion to that reached by the same court in the Roemer and Kaiser Cases."

The following circumstances would render it strange indeed if there were any real conflict in these decisions. The Schmidt opinion was delivered April 23, 1912. A shade less than a year later (April 8, 1913) the Roemer opinion was delivered by the same court; there having been in the meantime no change in its personnel. The Kaiser opinion was delivered November 4, 1919; four of the seven judges sitting being on the court when the Schmidt opinion was delivered. Two of the judges dissented in the Roemer Case, but the dissenting opinion does not allude to the Schmidt Case. There was no dissent in the Kaiser Case, although one of the dissenting judges in the Roemer Case was still a member of the court. The Roemer decision had the approval of five of the judges; and the Kaiser decision that of all seven, three of whom (including the author of the opinion) were not on the court when the Roemer decision was rendered.

The portion of the Schmidt opinion urged as being in conflict with that in the Roemer and Kaiser Cases reads: "By section 48 of chapter 4 of the charter, the city has power to direct and control the location of railroad tracks, and to require railroad companies to construct and maintain, at their own expense, such bridges, viaducts, tunnels, or other conveniences at public railroad crossings as the common council may deem necessary. Chapter 376, Laws of 1901, authorizes the city to itself construct such viaducts,

and to enter into negotiations with the railroad company for the payment of such proportion of the expense of constructing viaducts as may be agreed upon between them. But, taking section 48 of chapter 4 of the charter and section 6 of chapter 376, Laws of 1901, together, the police power of the city in this regard is in no wise diminished. The effect of chapter 376, supra, is to add to the powers of cities of the first class by giving them the option to build these viaducts, and by agreement with the railroad company share the expense of the construction of the viaducts. This is a grant of additional power, not a limitation upon the former police power."

We have carefully examined the Schmidt opinion and conclude that the point decided in the above quotation was not involved in the decision, and was therefore dictum. The question there was whether the proper procedure had been employed for assessing against the city damages to property abutting on public streets, resulting from the construction of viaducts in the streets. "The railway company," the court say, "was required to make the excavation and build the viaducts. * * * It is only when the city shall have determined itself to erect and construct such a viaduct that it may assess the damages sustained by the owner of abutting property in the manner provided by law for the determination and assessment of damages for the alteration of the grade of a street." Manifestly it was immaterial whether the city had power to share the expense. It was necessary, under the court's decision, for the construction to have been the work of the city. The controversy was therefore "not within the jurisdiction of the board of public works; consequently not within the jurisdiction of the circuit court in this case on appeal from that board."

But, even were the correctness of the dictum conceded, it would present no conflict, we think, with our holding. There, a legislative act expressly granted the city the power to negotiate with the railroad and share the expense. Here, there is no such grant, but only the general police power over the streets. The conditions and limitations under which the city may exercise this police power as applied to railroad grade crossings are prescribed in the charter by the electorate; and, unless we could say that these conditions and limitations were beyond the power of the electorate (a conclusion we have been unable to reach), they are valid and binding on the city.

It is strenuously urged that we cannot go behind the contract as finally executed by the city in determining whether the cost of additional right of way (items 2a, 2b, and 2c in the report) was a bona fide part of the consideration for property the city was acquiring from the railroad. We read from the motion: "What the Committee of Seven did or what their dealings or understanding were becomes immaterial and the only thing to be looked to is the action taken by the City governing body. This governing body decided to pay so much, cash, to the railroad for rights of way it would have to acquire over railroad property and in addition, as an added consideration, would pay the price of some of the rights of way that the railroad had to acquire."

It may be conceded that the city had the right, in acquiring this property from the railroad, to acquire other property and deed it to the railroad as a part of the consideration, or, what was tantamount to the same thing, reimburse the railroad for its outlay in acquiring such property. But it does not follow that the contract furnished exclusive and uncontrovertible evidence that this was in fact the transaction; and we are clear in the view that the record shows beyond reasonable peradventure, as held in our original opinion, that these items formed no part of the consideration for the railroad's property, but were shifted to that position in the contract solely to avoid any legal question as to the validity of the city's acts in this regard. If, as a matter of fact, these items did not constitute donations within the meaning of the invoked constitutional provisions (a question we did not, and do not, pass upon), then they constituted a part of the city's contribution to the grade-raising project. And, even if we are in error in holding that the city charter did not authorize such contribution, they were not, as held by us, included in the bond election ordinance.

One other point should probably be alluded to, although not involved in our decision. In discussing the storm sewer, we expressed some doubt whether it was embraced in the bond election ordinance. We concede that a storm sewer, necessary to and for the sole purpose of drainage of the underpasses, may properly be considered a part of the underpasses. The storm sewer in question, however, began at Fourth street, some distance west of the most westerly underpass, and served to drain a large municipal area in addition to the underpasses. The record does not show the character and cost of a storm sewer which would have been incident only to the underpasses. Our discussion of the matter should be read in the light of this situation. The point is unimportant under our decision, but we make this statement in the interest of clarity.

We adhere to our holdings upon the two points upon which we affirmed the trial court's judgment, and overrule the motion which questions our holdings upon those points.

Overruled.