RALPH BARRINGTON ET AL v. JIMMIE P. COKINOS ET AL.

No. A-7547. Decided July 20, 1960.
Rehearing Overruled October 5, 1960.
(338 S.W. 2d Series 133)

*E. B. Votaw* and *B. E. Wharton,* of Vidor, for Barrington, et al, appellants.

*George E. Murphy,* City Attorney, *King, Sharfstein & Seinstra* and *John D. Reinstra,* for the City of Beaumont, *Baker, Botts, Andrews & Sheppherd* and *Tom M. Davis,* all of Houston, *Keith, MeHaffy, McNicholas & Weber* and *Quentin Keith,* of Beaumont, for Texas and N. O. Ry. Co., *Hutcheson, Taliferro and Hutcheson,* of Houston, *Strong, Moore, Pipkin Strong & Nelson* all of Beaumont, for Missouri Pacific R. R. Co., appellees.

MR. JUSTICE WALKER delivered the opinion of the Court.

This case is before us on the following certificate from the Court of Civil Appeals at Beaumont:

"The above-styled cause is pending before us on second motion for rehearing. * * * One member of our court is disqualified from sitting in judgment on the case, and the accord between the remaining two members in respect to the questions we certify was not born of enthusiasm and is perhaps less than stable. The questions affect the right of the City of Beaumont to assume a major part of the burden and expense of relocating a railroad within its corporate limits; they are of great importance not only to Beaumont and its citizenship but to municipalities in general. * * *

"The City of Beaumont is a home-rule city, and among the provisions of its charter are the following:

'* * * *

'ARTICLE XV

FRANCHISES AND PUBLIC UTILITIES

'Section 10—POWER TO REGULATE TRACKS: The City Council shall have the power by ordinance to require any or all railroad companies operating any track or tracks upon or across any public streets of the City of Beaumont to reduce such tracks below the level of the streets intersected or occupied by such tracks, or to elevate such tracks above the level of the streets intersected or occupied by such tracks, and to require the company or companies owning or operating such tracks to provide necessary and proper crossing for the public travel at intersecting streets or to remove any tracks from any street occupied by such tracks and to reroute same as designated in the ordinance, provided that the railway company involved be given thirty (30) days notice prior to the adoption of the ordinance.'

"* * * *

"On August 12, 1950, the qualified voters of the City of Beaumont, at a bond election duly held for the purpose, authorized the City Council to issue serial bonds of the City in the amount of four million dollars 'for the purpose of paying part of the cost of the project for the elimination of railroad grade crossings from the public streets and highways in the City of Beaumont, and work and expenses appertinent to such separation of grades, and of paying the costs of constructing storm sewers in connection therewith, and paying the cost of opening, widening, extending and improving the public streets and highways in the City of Beaumont in connection therewith, * * *.'

"The authorization was anticipatory, because no definite plans or commitments for the City to participate in bringing about the changes and improvements contemplated by the bond proposition had been made when the election was held. But in 1957 the City and various railroad companies agreed upon a comprehenstve plan for a more or less general relocation of railroads and railroad facilities within the City's corporate limits and for grade separations at numerous street and rail intersections. And shortly afterwards the City, the State of Texas, Missouri Pacific Railroad Company, and Texas and New Orleans Railroad Company entered into contracts by the terms of which the City and the State are to finance the removal of a span of Missouri Pacific's railroad from its present location in the City to another. The city is to furnish the new right of way and is to pay all other expense of the project in excess of $550,000.00. The State, through its Highway Department, is to have the work done and is to contribute $550,000.00 toward paying the expense of it.

"The new right of way is to be adjacent to, and in part is to be, right of way that Texas and New Orleans Railroad Company held when the contracts were made. Subject to that company's rights, the City is to acquire, in its own name, title to all of the right of way that can be purchased upon acceptable terms and is then to convey the right of way to Missouri Pacific Railroad Company in fee. It is also to furnish the company with a policy of title insurance. So much of the right of way as cannot be purchased upon acceptable terms is to be condemned by the railroad company, but at the City's expense. When all of this has been done, Texas and New Orleans Railroad Company is to quitclaim to Missouri Pacific Railroad Company so much of the former's right of way as is involved in the project. And when the new span of railroad has been completed and has been ac-

cepted by Missouri Pacific Railroad Company as being in accordance with plans and specifications that have been agreed upon, that company is to abandon the supplanted portion of its existing right of way and is to quitclaim it to the City.

"The State's interest in relocating the span of railroad stems from a desire on the part of its Highway Department to eliminate one of two overpasses that otherwise will be necessary in a freeway the Highway Department, aided by the City, is constructing through the City of Beaumont. The City is immediately interested in furthering the freeway project, but the change in location of the span of railroad is also in keeping with and in furtherance of the previously-mentioned comprehensive plan for general relocation of railroads within the City.

"If Missouri Pacific's railroad is not placed adjacent to that of Texas and New Orleans Railroad Company so that one overpass can span both, two overpasses in close proximity to one another will be essential not only for safety's sake but in order that federal aid for the freeway can be obtained. And the Highway Department concluded that, as between the two alternatives, the proposed method of handling would be both preferable from an engineering standpoint and cheaper. The City concurred.

"The covenants of the parties are contained in two interdependent contracts, one of which is between the City and the two railroad companies, and the other of which is between the City, the railroad companies, and the State. The City's undertakings are covered by the former of the two; the State's, by the latter. The contracts bear different dates but became effective at the same time, and each refers to the other for supplementation. The one to which only the City and the railroad companies are parties bears date of December 17, 1957. The other one, which is referred to in the instruments themselves as the work contract, is dated January 29, 1958. By its express terms, the one bearing the earlier date was not to become effective until the other one had been signed.

"The contracts do not themselves touch upon how the City is to finance its part of the agreement, but the City proposes to use the proceeds of the tax bonds authorized at the 1950 election. Some of the bonds — $500,000.00 worth — were sold early in 1958 and others will be sold if additional money is needed.

"No effort by the City to compel Missouri Pacific Railroad

Company to reroute the span of railroad at company expense preceded the making of the contracts.

"Purporting to act not only for themselves but for all others similarly situated, three citizens who own taxable property within the City of Beaumont sued the City, its mayor, councilmen and manager, and the two railroad companies, seeking to have the contract of December 17, 1957, declared invalid and the City and its officers permanently enjoined from taking further steps toward discharging the City's commitments under it. As grounds for the relief sought, they in substance allaged, among other things: 1) That the contract commits the City to become a subscriber to the capital of a private corporation, or to make an appropriation or a donation to such corporation, or to loan its credit, and is therefore contrary to Section 3 of Article 11 of the Constitution. 2) That, since it expressly empowers or authorizes the City to require or compel railroad companies to effect grade separations at street and rail intersections and to remove and reroute their tracks (Sec. 10, Art. XV, supra), and does not expressly empower or authorize the City to proceed otherwise in bringing about those results, the City's Charter impliedly denies it authority to do the things the contract commits it to do (Expressio unius est exclusio alterius), and that the contract is therefore ultra vires and void. 3) That the contract negates or at least compromises the City's right to exercise its ordinary police powers to compel the railroad company to remove and reroute the span of railroad or to effect grade separations along it and is therefore contrary to public policy and void. The plaintiffs also sought to permanently enjoin the City and its officials from using proceeds of the bonds as contemplated, even if the contract of December 17 is valid, it being their position that the project to which the contract applies is not within the purpose for which the bonds were voted. Except as to some of the injunctive relief that was sought, the suit was brought under the Uniform Declaratory Judgments Act, Article 2524-1, Vernon's Texas Civil Statutes.

"* * * * The City and its officials also cross-acted against the plaintiffs, praying for a declaratory judgment adjudging the contracts to be valid and the City's proposed acts under or pursuant to them to be legally permissible.

"As pleaded in a general way by the defendants and as more fully developed by undisputed evidence, the general background of the contracts from the City's viewpoint is briefly this: The main lines of several railroads crisscross the City crossing, first

and last, at grade level, virtually all of the City's most heavily traveled streets. The two with which we are directly concerned pass completely across the city along east-west courses and is fairly close proximity to one another; and, with one exception, they cross all streets in their paths at grade level. They traverse the heart of the City's principal business district. The railroads are all heavily used and trains of great length pass along them frequently. Collisions between trains and street vehicles occur often in the city and a constant hazard to life and property exists from that source. The trains also impede and disrupt street traffic in a most vexing way. Moreover, the railroads and their ancillary tracks interfere in various ways with an orderly development of the city. Because of them, streets cannot be opened, extended and connected as public need demands, and neither business nor residential areas of the city can expand in accordance with what would otherwise be their normal patterns. The span of railroad which the City and State have contracted to move contributes its fair share to the untoward situation. Sixteen grade-level street crossings will be eliminated by the change.

"Such background supplies in large part the City's reasons and such justification as the City has for entering into the contracts in question. At the same time, it supplies the basis of the plaintiffs' claim that the evidence conclusively establishes that under its police power and the powers expressly conferred by Section 10, Article XV, of its Charter the City could compel Missouri Pacific Railroad Company to remove and reroute the span of railroad at company expense.

"Trial to the court, without a jury, resulted in a judgment renying the plaintiffs any relief and granting to the cross-plaintiffs the relief for which they prayed. * * * * The plaintiffs and cross-defendants duly perfected an appeal. This court affirmed the judgment of the trial court and, by written opinion, overruled appellants' first motion for rehearing. A second motion for rehearing was seasonably filed and has not been acted upon.

"We respectfully certify the following questions of law:

1. Is the contract of December 17, 1957, invalid because of the provisions of Section 3, Article 11, of the Constitution?

2. Did its Charter impliedly deny the City authority to make the contract of December 17, 1957?

3. Does the contract of December 17, 1957, infringe upon the City's police power in a manner or to an extent that renders the contract invalid?

4. If the foregoing questions have been answered in the negative, was an attempt by the City to compel Missouri Pacific Railroad Company to remove the span of railroad from its present location and reroute it at the company's own expense a condition precedent to the City's right to enter into the contract of December 17, 1957?

5. Are the City's undertakings under the contract of December 17, 1957, outside the scope of the bond proposition that was voted upon on August 12, 1950?"

■ We are confronted at the outset by appellants' suggestion that the certificate should be dismissed because the Court of Civil Appeals did not also certify the question raised by their second point of error in that court. The question presented by that point is whether the contract of December 17 could be authorized by a simple resolution of the City Council. In support of the position which they now take with reference to the sufficiency of the certificate, appellants cite Uvalde Rock Asphalt Co. v. Hightower, 135 Texas 410, 144 S.W. 2d 533. The intermediate court there prepared a tentative opinion and certified a number of questions but reserved for its own decision others which could have controlled the case. The certificate was dismissed because a determination of the questions submitted might have furnished no basis for a disposition of the appeal. Here the Court of Civil Appeals has decided that the contract was legally authorized by resolution, and there is nothing to suggest that the court entertains any doubt with respect to that holding. Under these circumstances we may assume that it will adhere thereto and that the certificate presents all questions which might affect its action on the motion for rehearing. It is nevertheless true that our answering the questions submitted will not necessarily bring this litigation to a prompt conclusion.

■ Appellants also point out that the cause could reach the Supreme Court by writ of error. Entirely aside from the rule laid down in the Hightower case, therefore, it lies within our discretion to determine whether the questions will be answered. Rule 461, Texas Rules of Civil Procedure. Final appellate disposition of cases in this category will often be materially delayed by submission of certified questions. If the present controversy comes to us by application for writ of error after the inter-

mediate court acts on the second motion for rehearing, the same will remain in the appellate courts much longer than would have been required for it to run the normal course. This is one of the reasons why we usually refuse to answer certified questions in a case which lies within our writ of error jurisdiction. See Duval v. Clark, 138 Texas 186, 157 S.W. 2d 626; Simpson v. McDonald, 142 Texas 444, 179 S. W.2d 239. Ordinarily the disqualification of one member of the Court of Civil Appeals and the fact that the other two are not entirely satisfied with their conclusions would afford no basis for deviating from that rule. In this instance, however, we did not dismiss the certificate promptly but set the cause for submission and the same was orally argued several months later. Having permitted this to be done, we will answer the questions rather than risk further delaying the matter by dismissing the certificate now.

■ The first question inquires whether the contract of December 17 contravenes Article XI, Section 2, of the Texas Constitution, which prohibits a county, city or other municipal corporation from becoming a subscriber to the capital of any private corporation or association, making any appropriation or donation to the same, or in anywise lending its credit. The contract clearly does not contemplate a subscription to capital, and there is no loan of credit or appropriation to the railroad unless it can be said that acquisition of the new right of way at municipal expense constitutes a donation to the company. The question thus narrows to whether the city has agreed to make an unconstitutional donation to a private corporation. In considering this and the other questions discussed below, we shall assume without deciding that the City of Beaumont might lawfully compel the Missouri Pacific to bear the entire cost of constructing grade separations at all public crossings which will be eliminated when the latter's tracks are relocated.

In City of Cleburne v. Gulf, C. & S. F. Ry. Co., 66 Texas 457, 1 S.W. 342, it was said that Article XI, Section 3, is broad enough to prohibit a city or town, in its corporate capacity, from appropriating its revenues or using its credit to obtain right of way or depot grounds for a railway company. That is true where, as in the cited cases, the purpose of the transaction is merely to secure for the municipality and its citizens the advantages of having a railroad within the corporate limits. Although the undertakings of the City of Cleburne evidently were supported by valuable consideration in the contractual sense, the expenditure did not serve any public purpose except by indirection through the services and facilities of a private company.

In the absence of a constitutional prohibition of this type, the construction of railroads has generally been recognized to be a public purpose for which public property may be used and private property taken. See Texas Cent. Ry. Co. v. Bowman, 97 Texas 417, 79 S.W. 295; 44 Am. Jur., Railroads, Sec. 50. Under the Constitution of 1869 and a statute enacted by the Legislature in 1871, the counties and municipalities of Texas were authorized to aid such construction by taking stock in and making loans or donations to railroad companies. The primary purpose of Article XI, Section 3, is to deprive these political subdivisions of that power. It does not prohibit all business dealings with private corporations and associations, but municipal funds or credit may not be used simply to obtain for the community and its citizens the general benefits resulting from the operation of such an enterprise. On the other hand an expenditure for the direct accomplishment of a legitimate public and municipal purpose is not rendered unlawful by the fact that a privately owned business may be benefitted thereby.

It was held in City of Beaumont v. Priddie, Texas Civ. App., 65 S.W. 2d 434 (judgments of the lower courts reversed and cause dismissed for mootness, Texas & N. O. R. Co. v. Priddle, 127 Texas 629, 95 S.W. 2d 1290), that Article XI, Section 3, does not preclude a city's contributing to the cost of constructing underpasses where railroad tracks cross public streets at grade even though the company could be required to do the work at its own expense. This conclusion and the reasoning of the court in support of the same were noted with approval when Article 6674w-4, Vernon's Ann. Texas Civ. Statt., was upheld against the contention that it permitted a grant of public money and an appropriation for private purposes in violation of Article III, Section 51, and Article XVI, Section 6, of the Constitution. State v City of Austin, 160 Texas 348, 331 S.W. 2d 737.

Instead of using municipal funds to construct grade separations required for the safety of the traveling public, the city has here agreed to furnish right of way for relocation of part of the railroad line. By the terms of the other contract the city and state will also pay the expense of moving the tracks to their new location, but we are here concerned with the right of way agreement. The contracts are prospective in their operation, and the relocation project is an integral part of a comprehensive plan designed to promote the public safety and convenience. Moving the Missouri Pacific tracks will eliminate some sixteen grade crossings. It will also provide five street

openings, require only one grade separation where Eleventh Street crosses both railroads, and require only one grade separation for Interstate Highway 10. Acquisition of the right of way for the railroad and moving its tracks thereto are the means adopted by the City Council for the accomplishment of a proper public and municipal purpose. It evidently concluded that the public interest will best be served by handling the railroad problem in this manner, and appellants do not contend that the decision to adopt this approach is fraudulent, arbitrary and capricious.

In these circumstances the fact that the railroad is relieved of financial burdens which it could be required to bear in a valid exercise of the police power does not render the right of way acquisition a donation to the company in the constitutional sense. State v. City of Austin, supra. Unlike the utility companies in that case, moreover, Missouri Pacific owns a valuable property interest in the present right of way which will be quit-claimed to the city when the relocation project is completed. Removal of the tracks from and abandonment of such right of way are essential to the execution of the overall plan, and the finding of the trial court that the company will receive no material or pecuniary benefit under the contract has not been challenged. Instead of receiving a gratuity, the railroad is simply being compensated for what it gives up by substitution of the new right of way for the old. See Austin v. Shaw, 235 N.C. 722, 71 S.E. 2d 25; Fitzsimmons & Galvin v. Rogers, 243 Mich. 649, 220 N.W. 881; Darwin v. Town of Cookeville, 170 Tenn. 508, 97 S.W. 2d 838; Dohany v. Rogers, 281 U.S. 362, 50 S. Ct. 299, 74 L. Ed. 904, 68 A.L.R. 434. In our opinion the contract does not involve an appropriation or donation to a private company or a loan of the city's credit within the meaning of Article XI, Section 3, and the first question is answered in the negative.

■ As we interpret the second question, it inquires whether Article XV, Section 10, of the city charter impliedly denies authority to make the contract of December 17 since the charter contains no provision expressly authorizing such an undertaking. Appellants argue that this section is exclusive and establishes the only means by which the city may effectuate a grade separation program. They rely upon the maxim *"expressio unius est exclusio alterius,"* and cite Foster v. City of Waco, 113 Texas 352, 255 S.W. 1104; City of Austin v. Thompson, 147 Texas 639, 219 S.W. 2d 57; and Ellis v. Holcombe, Texas Civ. App., 69 S.W. 2d 449 (wr. ref.). These cases stand for the

proposition that where a power is granted and the method of its exercise is prescribed, the prescribed method excludes all others and must be followed. The only method or procedure prescribed by Section 10 for an exercise of the power to require construction of grade separations or relocation of tracks is that an ordinance be adopted after thirty days' notice to the railroad. We are not called upon to decide whether the correct procedure has been followed in authorizing the contract. Our question is whether charter recognition of the power to compel action by the railroad amounts to a prohibition against the use of any other means to obtain the desired results.

The charter provision which was considered in City of Beaumont v. Priddie, supra, recognized the city's power to require a railroad to elevate, lower or relocate its tracks and also stipulated that the work should be done "at the expense of the railroad company or companies." The Supreme Court of Wisconsin has taken the position that such a provision is exclusive and precludes the expenditure of municipal funds for constructing grade separations, while at least two other jurisdictions hold to the contrary. City of Superior v. Roemer, 154 Wis. 345, 141 N.W. 250; Application of Kaiser, 171 Wis. 40, 174 N.W. 714, 176 N.W. 781; Austin v. Shaw, supra; Knoxville Ice & Cold Storage Co. v. City of Knoxville, 153 Tenn. 536, 284 S.W. 866. The Wisconsin view was adopted by the Court of Civil Appeals in the Priddie case. It reasoned that the city would have the same power to assess the entire cost against the railroad if the stipulation above quoted had ben omitted, and that its inclusion was supererogatory unless the same were intended to be exclusive and to require in all cases that the entire expense be paid by the railroad. The adoption of the particular charter provision some two years after the grade crossing problem had become so acute as to bring about public agitation for its solution was also emphasized. Against this background the omission from the present charter of the very language which was made the basis of that decision is of more than passing significance. Entirely aside from that circumstance, however, we are of the opinion that the provision now in question is not intended to be exclusive.

Any attempted exercise of the power to require construction of grade separations at railroad expense is always subject to review by the courts on the question of reasonableness. The reasonableness of a particular measure is thus a matter to be considered by the appropriate legislative body in the first instance. See State v. City of Austin, supra; Houston & T. C. R.

Co. v. City of Dallas, 98 Texas 396, 84 S.W. 648, 70 L.R.A. 850; Missouri-Kansas-Texas R. Co. of Texas v. Rockwall County Levee Imp. Dist. No. 3, 117 Texas 34, 297 S.W. 206; Lehigh Valley Railroad Co. v. Board of Public Utility Commissioners, 278 U.S. 24, 73 L. Ed. 161, 49 S. Ct. 69, 62 A.L.R. 805. We are assuming that the city might have compelled Missouri Pacific to construct grade separations where its present tracks cross existing public streets, but it is by no means clear that the company could have been required to move such tracks to a location adjoining that of the T & N. O. The City Council may have decided that the benefits to be gained by the public from such an undertaking are not commensurate with the burdens which would be imposed on the railroad. In any event it had no advance assurance that such an ordinance would be upheld by the courts.

To adopt the construction urged by appellants would mean that the city could not act except by exerting the full measure of its police power. If there were any doubt as to the reasonableness of a particular measure, important public improvements would frequently be delayed until the same could be tested in the courts. If the ordinance were then held to be unreasonable, it would be necessary for the city to sit idly by and take no steps for the protection of the public until the situation became so acute as to afford a reasonable basis for an exercise of the police power. An intention to limit the power of the city and its governing body in this manner cannot fairly be implied from a charter provision which simply recognizes that a railroad may be compelled to construct grade separations, provide proper crossings or relocate its tracks when the circumstances justify such action. The second question is answered in the negative.

The third and fourth questions will not be answered categorically because the same have not been briefed by appellants. Their third point of error in the Court of Civil Appeals asserts that the charter provision discussed above is exclusive and "therefore said contract as well as the resolution undertaking to authorize its execution were null and void and present a palpable attempt on the part of the defendant city officials herein to denude themselves of the police powers vested in them under said charter provision." Our answer to the second question disposes of this contention, and surrender of or infringement upon the police power is not mentioned elsewhere in appellants' brief. With respect to the fourth question we can only say that there is nothing in said charter provision or in Article

XI, Section 3, of the Constitution which requires an attempt by the city to compel Missouri Pacific to reroute the tracks at railroad expense as a condition precedent to making the contract of December 17.

While the fifth question is not entirely free from doubt, we have concluded that the city's undertakings under the contract are not outside the scope of the bond proposition approved by the electorate in 1950. Bonds were then authorized to be issued for the purpose, among others, of "paying part of the cost of the project for the elimination of railroad grade crossings from the public streets and highways in the City of Beaumont, and work and expenses incident to such separation of grades." Appellants make no attack on the proposition which was submitted or on the election as such. They contend only that an expenditure of the bond proceeds to acquire right of way for the railroad constitutes an unlawful diversion of the funds.

■ "It is elementary that the proceeds of bonds voted by the people must be expended for the purposes for which they were voted. It is also elementary that in instances where the law visits upon a governing body the duty to exercise its sound judgment and discretion, courts have no right to interfere so long as such body acts lawfully. In other words, a court has no right to substitute its judgment and discretion for the judgment and discretion of the governing body upon whom the law visits the primary power and duty to act. Of course, if such body acts illegally, unreasonably or aribtrarily, a court of competent jurisdiction may so adjudge, but there the power of the court ends." Lewis v. City of Fort Worth, 126 Texas 458, 89 S.W. 2d 975.

Appellants rely upon the holding of the Court of Civil Appeals in City of Beaumont v. Priddie, supra, that the proceeds of bonds voted for the purpose of improving streets, including the construction of underpasses necessary or incidental thereto and the acquisition of land therefor in and for the City of Beaumont, could not lawfully be used to acquire land for widening a railroad right of way. The court there reasoned that such a purchase could not be regarded as a street improvement or as an acquisition of land for the city. This decision has little application here, because the proposition approved by the voters at the later 1950 election is much broader in its scope.

According to the certificate of the Court of Civil Appeals, no definite plans or commitments for the city to participate in bringing amout the changes and improvements contemplated

by the bond proposition had been made when the election was held. The matter was necessarily prospective, and neither the city authorities nor the voters could know with particularity each item for which the proceeds of the bonds would be expended. Evidently it was for this reason that the proposal was submitted in rather general terms, and approval of the same by the electorate necessarily left to the sound judgment and discretion of the governing body the devising of a program or plan for the elimination of grade crossings which would be advantageous to the municipality and its citizens. The trial court found that the two contracts are part and parcel of an overall plan or project on the part of the city to eliminate public street crossings of railroad tracks at grade. This finding is not challenged, and we have already noted that performance of the existing agreements will result in the elimination of some sixteen grade crossings. Relocation of the Missouri Pacific tracks will also facilitate the construction of underpasses or overpasses where public thoroughfares cross the two railroads. Since acquisition of the new right of way is one step being taken by the city to effectuate a program which accomplishes at least one of the purposes for which the bonds were authorized, we do not think it can be said as a matter of law that the same is foreign to such purposes. The fifth question is answered in the negative.

Opinion delivered July 20, 1960.

Rehearing overruled October 5, 1960.