

# The Attorney General of Texas

**MARK WHITE**
Attorney General

Supreme Court Building
P.O. Box 12548
Austin, TX. 78711
512/475-2501

1607 Main St., Suite 1400
Dallas, TX. 75201
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905
915/533-3484

1220 Dallas Ave., Suite 202
Houston, TX. 77002
713/650-0666

806 Broadway, Suite 312
Lubbock, TX. 79401
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

May 15, 1981

Honorable Chris Victor Semos
Chairman
Committee on Business & Industry
House of Representatives
Austin, Texas   78769

Opinion No.   MW-337

Re:  Constitutionality  of  article
1066d, V.T.C.S., the Tax Increment •
Financing Act

Dear Representative Semos:

You  have  requested  the  issuance  of  an  opinion  regarding  the
constitutionality of article 1066d, V.T.C.S., in the absence of an enabling
amendment  to  the  Texas  Constitution,  "including  consideration  of  the
validity of each section of the statute and the validity of the statute in
toto."

Article 1066d, V.T.C.S., is popularly known as the Tax Increment
Financing Act of 1979.  It was enacted following the defeat in 1978 of a
proposed constitutional amendment dealing with tax increment financing.
Acts 1979, 66th Leg., R.S., ch. 695, at 1661. An appreciation of the defeated
proposal helps to place your request in perspective.  The 1978 proposal to
amend the constitution read:

> Notwithstanding  the  requirements  of  Section  1  of
> [Article VIII] or of Section 14 of Article VIII, the
> legislature  may,  subject  to  the  limitations  provided
> herein,  authorize  cities  and  towns  to  issue  tax
> increment bonds, the proceeds of which shall be used
> to finance the redevelopment of blighted areas, and
> the  payment  of  which  shall  be  provided  from  tax
> increments as such term is defined by the legislature.

See Acts 1977, 65th Leg., R.S., S.J.R. No. 44, at 3365. See also Acts 1979,
66th Leg., R.S., Table 2, Votes on Proposed Amendments, at 3266.

The  defeat  of  the  amendment  operated  ipso  facto  to  invalidate
anticipatory legislation passed in 1977 to implement the proposed amend-
ment — legislation which, in the absence of an enabling constitutional
amendment, was thought to violate both section 1, requiring that taxes be
equal and uniform, and section 14, governing the office and duties of the
county tax assessor and collector, of article VIII of the constitution.  That
1977 legislation (also codified as article 1066d, V.T.C.S., prior to its
invalidation) was similar in many respects  to the 1979 act at issue here,
including its formula for defining "tax increments."  The formula differed

only in that it took all property taxes into account, including county taxes, school district taxes, etc., and not merely the increment in municipal taxes. We make our review in that historical light. See Acts 1977, 65th Leg., R.S., ch. 361, at 956. See also Attorney General Opinion H-1191 (1978). Cf. V.T.C.S., art. 1269 1-3, §5b et seq. (Urban Renewal Tax Increment Financing); V.T.C.S. art. 1269j-4.12 (Public Improvement District Assessment Act of 1977).

The 1979 statute consists of twelve sections. Several are complex. You have asked that we comment on the validity of each section, but it will be necessary to consider some of them together and out of order.

The first section is devoted to definitions. The definitions are unexceptionable for the most part, but some will be noticed later. "Tax increment" is defined so as to represent the relative net change in assessed value of property after it is included in a tax incremental district. The difference in taxes collected from the district as a result of such increments in value is the measure of tax funds to be collected from the district for financing the construction of public improvements within the district. See V.T.C.S. art. 1066d, §1(H)(5).

The second section confers certain powers on incorporated cities and towns. Among them is the power to create tax incremental districts, to cause plans for improvement projects to be prepared, approved and implemented, to acquire property for the implementation of project plans, to issue tax incremental bonds and notes, to deposit money into the special funds of tax incremental districts, and to enter into "any contracts or agreements. . . determined. . . to be necessary or convenient to implement the provisions and effectuate the purposes of project plans." The import of these provisions depends on the construction given other parts of the act.

Section 3 provides, among other things, that in order to create a tax incremental district under the act, the ordinance adopted must contain findings that "the improvement of the area is likely to enhance significantly the value of substantially all of the other real property in the district." Id. §3(E)(ii). Twenty-five percent of the area must be "blighted," id. section 3(E)(i), but the definition of "blighted area" is extremely broad and includes, for instance, even an area "predominently open. . . which because of obsolete platting, diversity of ownership. . . or otherwise. . . impairs or arrests the sound growth of the community." Id. §1(1)(B).

Thus, the statute requires that any contemplated improvement must enhance the value of the property in the district created, and requires that the collection of "tax increments" from each parcel therein be in direct proportion to the amount by which the improvement has enhanced its value. In our opinion the tax incremental districts authorized by article 1066d, V.T.C.S., are a form of "special improvement" districts. See Davidson, Tax Increment Financing as a Tool for Community Redevelopment, 56 Journal of Urban Law, 406, 414 (1979) ("while tax increment financing is not a tax, it is analogous to special benefit taxation").

In Wharton County Drainage District No. 1 v. Higbee, 149 S.W. 381 (Tex. Civ. App. – Galveston 1912, writ ref'd), it was said:

> If a district is created which contains, or is supposed to contain, the property benefited by the improvement for which the assessment is levied, and if the exaction is levied upon the property in such district in proportion to the benefits conferred by such improvement, such form of exaction is regularly recognized as a local assessment and not as a form of general taxation.

Any tax incremental district created under article 1066d, V.T.C.S., is supposed to contain only property benefited by the improvement for which the tax increments are collected, and the increments are charged against property in the district in exact proportion to the benefits supposedly conferred by the improvement. We conclude that the increments represent "local" or "special" assessments under Texas law.

The difference between ordinary ad valorem taxes and special assessments was explained by the Texas Supreme Court in Taylor v. Boyd., 63 Tex. 533 (1885). It distinguished "ad valorem taxes," that is:

> such taxes as are annually collected for ordinary purposes of municipal government — . . . taxes based upon an estimation of the value of the entire taxable property in a city, from which an estimate is made of the per cent. of taxation, on this value, which will raise the sum necessary to be raised to meet the current annual want,

from "special assessments," saying:

> Assessments are not of that character, but are charges imposed for purposes which do not necessarily require that they be imposed annually, nor are they usually based on a percentage of the taxable value of the taxable property of a city, but upon the real or supposed benefit resulting from the improvement of the property on which the specific charge is laid. . . .

Article VIII, section 1, of the Texas Constitution is not offended by the creation of special assessment districts or the use of tax increments as a measure of the amount to be collected from such districts to pay for local improvements specially benefiting property in the district. Article VIII, section 1, reading in part, "[t]axation shall be equal and uniform. . . .," was one of the constitutional provisions expressly referred to by the constitutional amendment rejected in 1978. In City of Wichita Falls v. Williams, 26 S.W. 2d 910 (Tex. 1930), the court held that article VIII of the Texas Constitution:

> was not intended in any way to define, govern or limit the subject of special assessments. The power of the Legislature to authorize the levying of special assessments for the improvement of property is one which it has by reason of its reserved legislative power, against which we find no specific limitation

in the Constitution, except the usual constitutional guaranties
of due process, equal protection of the laws, etc.

See generally 30 Tex. Jur. 2d Improvements — Public, §1 et seq. at 344.

As used in article 1066d, V.T.C.S., in our opinion, a "tax increment" is merely a device to measure the size of the special assessment to be levied against a parcel of property for improvements specially benefiting the property. Since article VIII of the constitution does not "define, govern or limit" the subject of special assessments, the use of such a device for that purpose cannot, by itself, violate the "equal and uniform" provision, or any other provision, of article VIII.

But this does not mean that the proposed amendment defeated in 1978 was superfluous or that no "equal and uniform" problem is presented by the 1979 statute. Ad valorem taxes are subject to the "equal and uniform" requirement. The courts look to substance, not form, in tax matters. The effect of a levy, not the guise in which it is made, determines its character and legal consequences. See Conlen Grain and Mercantile, Inc. v. Texas Grain Sorghum Producers, 519 S.W. 2d 620 (Tex. 1975); Lower Colorado River Authority v. Chemical Bank and Trust Co., 190 S.W. 2d 48 (Tex. 1945). Article 1066d, if given its intended effect, would limit the ad valorem taxes for general city purposes ("to meet the current annual want") that could be collected from district property. While the present statute does not run afoul of section 14, article VIII, of the constitution concerning county tax assessors and collectors (another provision expressly mentioned by the defeated amendment), in our opinion, the intended operation of article 1066d does violate the first section of article VIII, the "equal and uniform" provision.

In form, this statute appears merely to allocate to the cure of blight a portion of municipal tax revenues. It is well settled that if the rate and manner of assessment of a tax is equal and uniform, the constitutional provision is satisfied though the tax revenue is expended in a manner that benefits some taxpayers more than others. See Wheeler v. City of Brownsville, 220 S.W. 2d 457 (Tex. 1949).

But in substance, this statute authorizes a municipality, by creating such a district, to refrain from levying an ad valorem tax "for general municipal purposes" against the full value of property located in the district if the value of the property has been enhanced by the improvement. Instead, the municipality then taxes for general municipal purposes only that part of the property that does not represent enhanced value. Another charge is levied against the enhanced value that escapes ad valorem taxation, but it is levied (at a like rate) for the special purpose of paying for the enhancing improvement.

The difference between ad valorem taxes and special assessments is in the purpose for which they are collected. Taxes evenly collected for general municipal purposes, i.e., ad valorem taxes, do not violate the "equal and uniform" rule though they are spent unevenly for public improvements which incidentally benefit some citizens more than others. But amounts collected expressly to benefit particular private parcels are not collected "for general municipal purposes," and the benefits

accruing to district property owners by reason of money collected and spent pursuant to article 1066d would not be merely "incidental." The statute specifically makes it a primary requisite that all the property in the district be specially benefited by an improvement project, and that each parcel of property in the district be charged for the purpose of paying for the improvement, but only to the extent of the benefit the parcel presumably realizes. Unless that condition is met, tax increment financing cannot be utilized under the statute.

Tax increments, as defined by article 1066d, are not collected for general municipal purposes and cannot be used for general municipal purposes. In effect, the statute authorizes two taxes against district property, each for a different purpose. An ad valorem tax for general municipal purposes and a special assessment for the special purpose of improving a particular district are two different levies, though they be put in one package. That the rate is the same for each tax, and that the sum of the two taxes levied against district property will exactly equal the single tax for general city purposes levied against non-district property, does not mean that the rate and manner of ad valorem taxation is equal and uniform city wide. It means the opposite: a parcel of property located in the tax incremental district (if its value has been enhanced) will not pay the same amount or ratio of taxes for the general support of the city that will be paid by a parcel of equal value located outside the district.

The 1979 statute nowhere expressly purports to reduce the level of ad valorem taxation imposed on district property for the general support of the municipality, and it might be read as merely using a tax incremental formula as a measure for assessments to be added to the normal tax load for district property. That is the ordinary method of imposing special assessments. However, when sections one and two of the statute are read with sections seven and eight, it is clear that the 1979 act contemplates deducting the special assessment for improving the district, measured by the tax increment, from the municipal tax burden that property in the district would otherwise share with property outside the district.

The latter arrangement, if implemented, would unconstitutionally impact the general tax burden of all taxable property in the city by systematically exempting a portion of the value of property located in the district from the municipal taxation necessary "to meet the current annual want," i.e. from ad valorem taxation that is subject to the "equal and uniform" requirement of article VIII, section 1. See City of Arlington v. Cannon, 271 S.W. 2d 414 (Tex. 1954); Anderson County Taxpayers League v. City of Palestine, 576 S.W. 2d 679 (Tex. Civ. App. - Tyler 1979, no writ). All other property would have 100% of its value taxed to meet the ordinary needs of the city, but district property would have only a part of its value taxed for that purpose, causing an unequal distribution of the ad valorem tax burden.

We conclude that the 1979 statute, article 1066d, V.T.C.S., violates article VIII, section 1, of the Texas Constitution and is invalid in the absence of an enabling constitutional amendment. See generally Texas & P. Ry. Co. v. Ward County Irr. District No. 1, 251 S.W. 212 (Tex. 1923); Dallas County Levee District No. 2 v. Looney, 207 S.W. 310 (Tex. 1918); Higgins v. Bordages, 31 S.W. 52 (Tex. 1895); Uvalde Rock Asphalt Co. v. Conray, 71 S.W. 2d 315 (Tex. Civ. App. - Galveston 1934, writ ref'd); City

of Marshall v. Elgin, 143 S.W. 670 (Tex. Civ. App. - Texarkana 1912, writ ref'd). Cf. County of Harris v. Shepperd, 291 S.W. 2d 721 (Tex. 1956) (local tax); Evans v. Whicker, 90 S.W. 2d 554 (Tex. 1936) (priority of liens). The statute cannot be saved by considering it as creating a separate taxing district so that within the district, at least, ad valorem taxes are equal and uniform. No governmental unit is a taxing district in that sense unless the constitution expressly confers powers of taxation on it. See City of Fort Worth v. Davis, 57 Tex. 225 (1882). See also Norris v. City of Waco, 57 Tex. 635 (1882).

Reading the statute as authorizing the collection of tax increments atop normal taxes would save it from article VIII invalidity but render it unconstitutional under the Due Process Clause of the federal Constitution. The statute leaves it to city officials to determine which property owners, if any, are to be included in a district and, thus, assessed, but makes no provision for protesting owners to be heard. See City of Houston v. Fore, 412 S.W. 2d 35 (Tex. 1967). In any case, as said by the Supreme Court in City of Austin v. Cahill, 88 S.W. 542, 89 S.W. 552 (Tex. 1905), "[I]t would not be proper to ascribe to it a meaning at variance with its plain import, so as to conform it to constitutionality or wisdom."

Tax increment financing is a relatively new device that each jurisdiction must examine in the context of its own constitution and judicial precedents. California amended its constitution to accomodate tax increment financing. See Calif. Const. art. 16, §16. While tax increment financing statutes have been judicially approved in some states without a constitutional amendment, the courts which have done so have dealt with statutory schemes essentially different from the pattern of article 1066d, V.T.C.S., or have looked to constitutional restrictions not as stringent as those of the Texas Constitution.

Where the question of "equal and uniform" taxation has been raised and addressed, it has not been raised in a "special assessment district" context and any disparity between district and non-district burdens in the allocation of property charges for the general support of the municipality has been justified on the basis that the entire community will eventually benefit from the anticipated additional tax revenue to be realized after the cost of the improvements has been recovered, if the economic value of district property is increased. The same could be said for an expected future yield of tax revenues from property improved by special assessments. But that justification is not sufficient in Texas.

In Texas, ad valorem taxes are laid for the purpose of meeting "current annual want." Taylor v. Boyd, supra. The scheme of tax increment financing is to currently exempt a portion of the value of property from its share of general revenue taxes until the cost of improvements are paid, in hopes that the taxes lost will be more than recouped later when the value of the property has increased. It is similar to schemes endorsed in other states, but not in Texas, of exempting from ad valorem taxes for a period of time those private companies willing to locate in a community, all in the expectation that a general benefit to the community and increased future revenues will result. Cf. City of Cleburne v. Gulf C. & S.F. Ry. Co., 1 S.W. 342 (Tex. 1886). But the taxes necessary to meet the current annual want are those which the Texas Constitution insists be equal and uniform. Tex. Const. art. VIII, §1.

The following are among those cases from other jurisdictions that we have considered:  State v. Miami Beach Redevelopment Agency, 392 So. 2d 875 (Fla. 1981) (uses tax increment as "measure" only; equality and uniformity not addressed); People v. Crouch, 403 N.W. 2d 242 (Ill. 1980) (tax allocation device similar to 1977 Texas legislation invalidated by defeat of 1978 constitutional amendment); State v. City of Topeka, 605 P. 2d 556 (Kan. 1980) (tax allocation scheme similar to invalidated 1977 Texas legislation); Sigma Tau Gamma v. City of Menomonie, 288 N.W. 2d 85 (Wis. 1980) (tax allocation scheme similar to 1977 Texas legislation; special assessment/ ad valorem tax dichotomy not addressed); Denver Urban Renewal Authority v. Byrne, 618 P. 2d 1374 (Colo. 1980) (special assessment type argument not addressed for lack of standing); City of Sparks v. Best, 605 P. 2d 638 (Nev. 1980) ("friendly suit"; equal and uniform arguments not addressed); Metropolitan Development and Housing Agency v. Leech, 591 S.W. 2d 427 (Tenn. 1979) (tax allocation device similar to invalidated 1977 Texas legislation); Short v. City of Minneapolis, 269 N.W. 2d 331 (Minn. 1978) (scheme under which city acquires and resells property to private developers; equality and uniformity not addressed); Salt Lake City County v. Murray City Redevelopment, 598 P. 2d 1339 (Utah 1979); Tribe v. Salt Lake City Corporation, 540 P. 2d 499 (Utah 1975) (special agency or district with taxing powers).

In our opinion, such cases are not persuasive that article 1066d, V.T.C.S., is consistent with article VIII, section 1 of the Texas Constitution.   As noted above, several courts from other jurisdictions have upheld multi-district "tax allocation" schemes similar to the plan of the 1977 Texas legislation that fell when the proposed constitutional amendment failed in 1978.  Under their rationales, the 1977 legislation would have been valid without the constitutional amendment — a circumstance that makes them particularly unreliable instruments with which to guage the validity of a statute under the Texas Constitution.

Inasmuch as we consider the statute fatally defective for the above reasons, our consideration of its other aspects will be brief where possible.

Although section 3 of the statute, when considered with the rest, makes no provision to secure with a "substantial equivalent" those pre-existing municipal creditors who may have a call on all taxable property and who might be disadvantaged by the withdrawal of a portion of its value from their reach, the omission does not make the statute facially unconstitutional as impairing the obligation of contract. The statute does not limit the tax burden that may be imposed on property that is fully taxed, so a pre-existing creditor could be harmed only if the constitutional ceiling on municipal debt, when coupled with the failure of the city to fully tax district property, would make enforcement of his claim impossible. See Tex. Const. art. XI, §5; City of Austin v. Cahill, supra.  In particular situations the statute might be found to be unconstitutionally applied on this ground, but it is not facially unconstitutional. See U.S. Const. art. I, §10, cl. 1; Tex. Const. art. I, §16; Delta County Levee Imp. District No. 2 v. Leonard, 559 S.W. 2d 387 (Tex. Civ. App. - Texarkana 1977, writ ref'd n.r.e.). Cf. Preston v. Anderson County Levee Imp. Dist. No. 2, 261 S.W. 1077 (Tex. Civ. App. - Texarkana 1924, no writ). The same is true of the provision in section 9, subsection (2), that allows the dissolution of the district before the retirement of obligations associated therewith.

Similarly, although section 4 of article 1066d, V.T.C.S., limits the percentage of residential property that may be included in a district, see Attorney General Opinion MW-301 (1981), we do not think any unconstitutional deprivation of equal protection under the law would result were there no other constitutional problems, notwithstanding an obvious advantage to the owners of property located in a district where public funds are by law particularly devoted to increasing the economic value of property therein without additional cost to the owners. See U.S. Const. amend. 14; Tex. Const. art. I, §3. Though article 1066d does not reflect any legislative findings or declarations on the matter, we are unable to say that no reasonable basis for such a preference could exist. Liens for the payment of such charges — charges that are not taxes within the meaning of article XVI, section 50 of the constitution — could not be enforced against homestead property as they could against other property, including other property exempt from ordinary taxation. See Higgins v. Bordages, supra. See also City of Wichita Falls v. Williams, supra; Mount Olivet Cemetary Co. v. City of Fort Worth, 275 S.W. 2d 152 (Tex. Civ. App. - Fort Worth 1955, writ ref'd n.r.e.).

Section 5, which concerns the board of directors, presents no insurmountable constitutional problems. See Kaufman County Levee Imp. District v. National Life Insurance Co., 171 S.W. 2d 188 (Tex. Civ. App. - Dallas 1943, writ ref'd). We construe section 6, relating to the delegation of powers to the board, as intended to authorize only those delegations of authority that meet constitutional requirements. No plain intent to do otherwise is evidenced. See Burch v. City of San Antonio, 518 S.W. 2d 540 (1975); Spann v. City of Dallas, 131 S.W. 2d 1079 (Tex. Civ. App. - Dallas 1939, writ ref'd); 40 Tex. Jur. 2d Rev. Part I Municipal Corporations §334, at 97. We similarly view related provisions in section 2.

Sections 7 and 8, determining the calculation and allocation of tax increments, have previously been discussed. Section 9 also has been discussed above. Section 10 is not facially unconstitutional as a violation of article III, section 52 or article XVI, section 6 of the constitution, though it permits the use of general city funds to pay project costs otherwise payable from assessments — assuming a proper public purpose is served thereby. Those provisions prohibit gifts to private persons or appropriations to private purposes. Not every measure is unconstitutional that relieves private parties of financial burdens they could otherwise be forced to bear. Barrington v. Cokinos, 338 S.W. 2d 133 (Tex. 1960); State v. City of Austin, 331 S.W. 2d 737 (Tex. 1960). See also Davis v. City of Lubbock, 326 S.W. 2d 699 (Tex. 1959); Housing Authority of City of Dallas v. Higginbotham, 143 S.W. 2d 79 (Tex. 1940). The application of this provision, if coupled with binding agreements to supplement the fund, is discussed below.

Section 11 governs the issuance of bonds and notes under the act. It is valid if by doing so a city does not incur debt in the constitutional sense or potentially embarrass the exercise of its governmental functions; otherwise, it is not.

Article XI, section 5, of the constitution, relating to home rule cities, specifies, "[n]o debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund of at least two per cent thereon." Article XI, section 7, applicable to all

cities, requires the levying and collecting of a tax therefor. "Debt," as used in these provisions, means any pecuniary obligation imposed by contract, except such as were, at the date of the contract, within the lawful and reasonable contemplation of the parties, to be satisfied out of the current revenues for the year or out of some fund then within the immediate control of the corporation. McNeill v. City of Waco, 33 S.W. 322 (Tex. 1895).

The statute at hand, article 1066d, makes no provision for the collection of a tax to defray such obligations. Special assessments are not taxes within the meaning of those constitutional provisions. City of Fort Worth v. Bobbitt, 36 S.W. 2d 470, 41 S.W. 2d 228 (Tex. 1931). Nor does the statute provide for the "annual collection" of any sum. It provides for the augmentation of a special fund if positive tax increments accrue, if pledged revenues are realized from the project financed, or if the city governing body elects to deposit other monies therein. V.T.C.S. art. 1066d, §8(b). In those events, deposits to the fund are mandated, but occurence of the events is uncertain.

Section 11(d) of the statute specifies that tax incremental bonds or notes are payable "only out of the special fund created under Subsection (b) of Section 8 of this Act." But the only "tax incremental bonds or notes" that the statute authorizes a city to issue are those:

> payable out of positive tax increments or out of a combination of positive tax increments and all or part of the net revenue produced by a facility acquired, improved, or constructed pursuant to a project.

V.T.C.S. art. 1066d, §11(a).

Thus, such obligations cannot be paid with any of the extra money the city is authorized to appropriate for deposit to the special fund. Money coming to the fund from that source can, of course, be used under the statute to pay project costs not financed by the sale proceeds of bonds or notes, id. section 10, and so long as the use of appropriations deposited to the special fund is so restricted, additional constitutional problems do not arise. Cf. Navarro Auto-Park v. City of San Antonio, 574 S.W. 2d 582 (Tex. Civ. App. - San Antonio 1978, writ ref'd n.r.e., 580 S.W. 2d 339).

A more serious matter is the permitted use of "net revenue produced by a facility" for the payment of bonds or notes. The definition of "net revenue produced" is not given, and the types of facilities which may be acquired, improved or constructed pursuant to a project are not expressly limited to those which cities own and operate as proprietary functions rather than as governmental functions. Section 11(e) of the statute further specifies:

> To increase the security and marketability of tax incremental bonds or notes, the city may:
>
> (1) Create a lien for the benefit of the bondholders on any public improvements or public works financed thereby or

the revenues therefrom if revenues are not otherwise pledged; or

(2) Make covenants and do any and all acts necessary or convenient or desireable in order to additionally secure bonds or notes or tend to make the bonds or notes more marketable according to the best judgment of the city governing body.

A charge against the revenues of a facility is a charge against the facility itself. City of Dayton v. Allred, 68 S.W. 2d 172 (Tex. 1934). It is constitutionally impermissible for a political subdivision to enter into a contract that has the effect of potentially controlling and embarrassing it in the exercise of its governmental powers. Clear Lake City Water Authority v. Clear Lake Utilities Company, 549 S.W. 2d 385 (Tex. 1977); City of Brenham v. Brenham Water Co., 67 Tex. 542 (1887); Bowers v. City of Taylor, 16 S.W. 2d 520, (Tex. Comm. App. 1929), rehearing denied, 24 S.W. 2d 816 (Tex. Comm. 1930); Pittman v. City of Amarillo, 598 S.W. 2d 941 (Tex. Civ. App. - Amarillo 1980, writ ref'd n.r.e.); Fidelity Land & Trust Co. v. City of West University Place, 496 S.W. 2d 116 (Tex. Civ. App. - Houston 1973, writ ref'd n.r.e.); Cibola Creek Municipal Authority v. City of Universal City, 568 S.W. 2d 699 (Tex. Civ. App. - San Antonio 1978, no writ). Cf. City of Big Spring v. Board of Control, 404 S.W. 2d 810 (Tex. 1966) (non-governmental function); City of Crosbyton v. Texas-New Mexico Utilities Co., 157 S.W. 2d 418 (Tex. Civ. App. - Amarillo 1941, writ ref'd w.o.m.) (non-governmental function). The foreclosure of a lien upon facilities essential to the discharge of a city's governmental duties would obviously impair or embarrass the discharge of them. In our opinion, any attempt by a city to apply these statutory powers to facilities other than those held purely in a proprietary capacity would be unconstitutional. See also Nairn v. Bean, 48 S.W. 2d 584 (Tex. 1932). Cf. Lower Neches Valles Authority v. Mann, 167 S.W. 2d 1011 (Tex. 1943); City of Dayton v. Allred, supra; City of Nederload v. Callihan, 299 S.W. 2d 380 (Tex. Civ. App. - Beaumont 1957, writ ref'd n.r.e.) (governmental/ proprietary distinction not addressed).

Even as to facilities held by a city in its proprietary capacity, under article 1066d, V.T.C.S., a city could not unreservedly pledge to operate the facility so as to produce revenues — unless it first complied with constitutional requirements respecting the annual assessment and collection of a tax sufficient to secure the obligation. Such compliance would be necessary because the cost of operating project facilities is apparently not a "project cost" which may be paid from the special fund created, and an undertaking to operate them would constitute a debt within the meaning of the constitution. See City of Wichita Falls v. Kemp Public Library Board of Trustees, 593 S.W. 2d 834 (Tex. Civ. App. - Fort Worth 1980, writ ref'd n.r.e.).

The statute limits the purposes for which money may be withdrawn from the fund. Section 8(b) of article 1066d specifies:

... if bonds or notes issued under Section 11 of this Act are repayable in whole or in part from revenue produced by a facility acquired, improved, or constructed pursuant to a

project, the city shall deposit the pledged revenues in the fund. Money shall be paid out of the fund only to pay project costs of the district, to reimburse the city for the payments, or to satisfy claims of tax incremental bonds or notes issued for the district. . . . (Emphasis added).

The "project costs" payable out of the fund are limited by section 1(3) to:

Any expenditures made or estimated to be made or monetary obligations incurred or estimated to be incurred by the city which are listed in a project plan as costs of public works or improvements within a tax incremental district, plus any costs incidental thereto, diminished by any income, special assessments, or other revenues, other than tax increments, received or reasonably expected to be received by the city in connection with the implementation of the plan.

A number of costs are particularly described as being included in the term "project costs," Id., but the cost of operating project facilities to produce revenue is not among them, nor does the statute explicitly permit the use of proceeds from the sale of bonds or notes for ordinary operating expenses year-in and year-out. It seems apparent that costs of operating project facilities must be funded from some other source, but whether or not the use of the special fund for that purpose is proscribed, any agreement by the city binding it to operate such facilities with general funds of the city would constitute the assumption of debt within the meaning of the Texas Constitution. City of Wichita Falls v. Kemp Public Library Board of Trustees, supra. See City of Fort Worth v. Bobbitt, supra; McNeill v. City of Waco, supra.

We conclude that section 11 of the statute is not unconstitutional on its face, but would be held unconstitutional in application if not narrowly applied. See generally 40 Tex. Jur. 2d Rev. Part 1 Municipal Corporations §587 et seq. (bonds). Cf. V.T.C.S. arts. 701 et seq.; 1106 et seq.; 1175; 2368a. The last section of article 1066d, section 12, concerns overlapping tax incremental districts and is not, by itself, unconstitutional.

You have asked that we comment on the overall validity of the statute in addition to discussing its various sections with particularity. In our opinion, article 1066d, V.T.C.S., is facially unconstitutional because it violates the "equal and uniform" requirement of article VIII, section 1 of the Texas Constitution, but not otherwise. A determination of unconstitutionality on other grounds can be avoided by construing and applying the statute narrowly.

## SUMMARY

Article 1066d, V.T.C.S., is facially unconstitutional because it violates the "equal and uniform" requirement of article VIII, section 1, of the Texas Constitution. A finding of unconstitutionality on other grounds is avoided by construing and applying the statute narrowly.

Very truly yours,

MARK WHITE
Attorney General of Texas

JOHN W. FAINTER, JR.
First Assistant Attorney General

RICHARD E. GRAY III
Executive Assistant Attorney General

Prepared by Bruce Youngblood
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Susan L. Garrison, Chairman
Jon Bible
Rick Gilpin
Jim Moellinger
Bruce Youngblood