# Supreme Court of Texas

No. 24-0102

JPMorgan Chase Bank, N.A.,

*Petitioner*,

v.

City of Corsicana and Navarro County,

*Respondents*

On Petition for Review from the
Court of Appeals for the Tenth District of Texas

## Argued September 11, 2025

CHIEF JUSTICE BLACKLOCK delivered the opinion of the Court.

Justice Lehrmann and Justice Devine did not participate in the decision.

Several clauses of the Texas Constitution require that public money be used only for public purposes. Known as the Gift Clauses, these nineteenth-century provisions arose from skepticism about entanglement between public funds and private enterprise. This Court has derived three principles from the text and history of the Gift Clauses. A grant of money to a private entity must not be gratuitous;

its predominant objective must be to accomplish a legitimate public purpose; and the government must retain control over the funds to ensure that the public purpose is served. *See Borgelt v. Aus. Firefighters Ass'n*, 692 S.W.3d 288, 301 (Tex. 2024).

In 1987, Texans ratified article III, section 52-a, which authorizes the legislature to permit "loans and grants of public money" for, as relevant here, "the public purposes of development and diversification of the economy." Until today, this Court had not addressed the provision. This case asks whether our longstanding Gift Clause precedents continue to govern the economic-development grants and loans authorized by section 52-a. The answer is yes. Economic-development grants authorized by section 52-a remain subject to the Gift Clauses' requirements.

As explained below, section 52-a was adopted primarily to establish that "development and diversification of the economy" would qualify as a legitimate public purpose under this Court's pre-existing Gift Clause cases. Nothing in section 52-a's text or history indicates a desire to exempt economic-development projects from the kind of constitutional scrutiny to which the Gift Clauses subject all public expenditures in Texas. The Gift Clauses' prohibition on gratuities and requirement of adequate controls therefore continue to apply when state and local governments spend public funds on economic development.

The court of appeals resolved this threshold legal question correctly. We disagree, however, with its application of our Gift Clause precedent to the circumstances of this case. To spur development of a large new shopping center, the City of Corsicana and Navarro County

2

pledged future sales-tax revenues to finance the construction of a Gander Mountain store to anchor the shopping center. When the Gander Mountain store closed after eleven years in business, the City and the County stopped making payments under the theory that the store's closure extinguished the public purpose of the economic-development agreements. The lower courts agreed with the City and County and granted summary judgment.

We take a different view. The City and County could have negotiated an agreement that made continued payments contingent on continued operation of the planned Gander Mountain store. They did not. Even so, the government cannot make an unconstitutional payment merely because a contract purports to require it. But the *constitutional* question in this case, as distinct from the contractual question, cannot be neatly reduced to whether a particular Gander Mountain store continued to operate throughout the life of the parties' agreements. What matters for constitutional purposes is whether: (1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; and (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished. *Borgelt*, 692 S.W.3d at 301. This constitutional inquiry does not ask whether the parties' economic expectations for the project have come to pass precisely as initially envisioned. Instead, courts assessing the constitutionality of an economic-development deal must take into account not merely the parties' contractual goals but also any other facts indicating whether the deal was genuinely designed to, and

3

actually did, advance the public purpose of economic development, which the people of Texas have declared a valid public purpose.

In this case, despite the Gander Mountain store's eventual failure, the disputed grants apparently facilitated the development of a shopping center that has generated considerable economic activity and tax revenue both during and after Gander Mountain's eleven-year occupancy of the site. The closure of the particular business envisioned at the outset of the arrangement does not, as a constitutional matter, establish that the project serves no public purpose or that its controls were constitutionally inadequate. Summary judgment for the City and County was therefore improper. The judgments below are reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

## I.

In December 2003, the Corsicana Chamber of Commerce pitched now-defunct outdoor retailer Gander Mountain on a $16 million incentive package to develop a flagship store in Corsicana. The Gander Mountain, together with a planned Home Depot, would anchor a 132-acre business park called "Corsicana Crossing." In return, Gander Mountain would receive 2% of the sales tax from its store and the Home Depot and 1% of the sales tax from any new development, among other incentives.

Within a few months, the City of Corsicana and Navarro County authorized agreements with the Corsicana Industrial Foundation—a nonprofit corporation that owned the project site—to build the Gander Mountain facility. The City granted the Foundation 1.5% of the sales

4

tax generated by Gander Mountain and Home Depot and 0.75% from other businesses in the shopping center. Navarro County granted 0.5% and 0.25%, respectively. The Foundation agreed to use the dedicated funds solely to repay debt incurred for the facility's construction. To that end, the agreements required the City and County to deposit the pledged sales-tax proceeds into a "Grant Fund," into which all grant proceeds were placed and from which funds could be withdrawn only to pay the construction-loan debt. The agreements' stated purpose was "to facilitate the development of the Retail Center and assist in the implementation of the economic-development objectives of the" City and County.

A few months later, the City, County, Foundation, and Gander Mountain executed another agreement. This agreement stated that it was "in the public interest to promote the economic development of the Gander Mountain Facility" and to commit portions of sales-tax revenue "to facilitate such economic development." Payments would begin "following the completion and opening of Gander Mountain." In return, the Foundation agreed to take out a $10 million construction loan—with the tax payments pledged as security—and to use the money solely for constructing the facility.

At the same time, the Foundation and Gander Mountain executed a lease for the site. The base rent equaled the quarterly loan payment minus the sales-tax grants. Gander Mountain could purchase the premises for $1 once the loan was paid off or the lease expired. The lease

also anticipated a separate development agreement that would set out each party's obligations concerning the project.[1]

The store opened in August 2004, and things worked as planned for the next eleven years. Gander Mountain operated continuously; the City and County together paid about $150,000 per quarter in sales-tax revenues to the Foundation; and the Foundation used the money to service the loan. The record leaves little doubt that "Gander Mountain contributed to the success of the center for more than a decade," such that the "Corsicana Crossing [shopping center] may not have materialized without Gander Mountain."

Gander Mountain closed the store in 2015, apparently after discovering structural defects in the building. The shopping center, however, continued to operate. It also continued to generate substantial tax revenues. Gander Mountain's former spot in Corsicana Crossing is now occupied by Fun Town RV, which sells RVs and related products.

In February 2016, the City and County each decided that the closure of Gander Mountain ended the public purposes justifying the grants. They sued the Foundation and Gander Mountain, seeking declaratory judgment on five issues:

1. Whether closing the store extinguished the public purposes authorizing the grants;

2. Whether the agreements and related documents lacked sufficient controls to ensure those purposes were met;

---

[1] This agreement is not in the record.

6

3. Whether the agreements were unconstitutional because they allowed public funds to be spent without adequate safeguards;

4. Whether continuing to grant sales-tax revenue after the store's closure would be unconstitutional; and

5. Whether the agreements were unconstitutional to the extent they required such payments once public purposes ceased.

The defendants responded with counterclaims. JPMorgan Chase, the project's lender, intervened. The City and County moved for partial summary judgment on their declaratory-judgment claims. Shortly after, Gander Mountain filed for Chapter 11 bankruptcy. The trial court granted summary judgment for the City and County and entered final judgment declaring the agreements unconstitutional. The court declared that "the closing of the Gander Mountain store extinguished the public purposes [that] authorized the City's and County's grants of public money." It also determined that the agreements "failed to place sufficient controls on the transaction to ensure that the public purposes for which the original grants of sales tax were made were carried out." The court declared the agreements "unconstitutional, void[,] and illegal."

The court of appeals affirmed. 685 S.W.3d 171 (Tex. App.—Waco 2024).[2] It held that article III, section 52-a does not displace the requirements of the Gift Clauses and thus applied the framework from *Texas Municipal League Intergovernmental Risk Pool v. Texas Workers'*

---

[2] After perfecting its appeal, the Foundation assigned its rights in the lawsuit to JPMorgan Chase. 685 S.W.3d at 177.

*Compensation Commission* (*TML*), 74 S.W.3d 377 (Tex. 2002). 685 S.W.3d at 180. As we recently clarified in *Borgelt*, that framework asks whether: (1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; and (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished. 692 S.W.3d at 301.

The court of appeals agreed that the store's closure extinguished the public purpose of the grants and that the agreements lacked adequate controls. 685 S.W.3d at 182–85. It held that the agreements were unconstitutional and affirmed summary judgment for the City and County. *Id.* at 186. A dissenting Justice found the evidence insufficient at the summary judgment stage to say that the agreements failed the constitutional test. *Id.* at 186–87 (Gray, C.J., dissenting).

Chase petitioned for review, arguing that the Gift Clause framework taken from *TML* and *Borgelt* does not apply to economic-development grants authorized by section 52-a or, alternatively, that the lower courts misapplied it. We granted the petition.

## II.

Adopted in 1987—over a century after the Gift Clauses— article III, section 52-a provides, as relevant here:

> Notwithstanding any other provision of this constitution, the legislature may provide for the creation of programs and the making of loans and grants of public money . . . for the public purposes of development and diversification of the economy of the state, the elimination of unemployment or underemployment in the state, . . . or the development or expansion of transportation or commerce in the state.

8

TEX. CONST. art. III, § 52-a.

The initial question before us is this: Did section 52-a categorically exempt economic development from the pre-existing requirements of the Gift Clauses, as Chase contends? Or did section 52-a establish that economic development qualifies as a public purpose within the traditional Gift Clause framework, as the City and County argue?

The provision's text authorizes the legislature to provide for economic-development grants and loans "[n]otwithstanding any other provision of this constitution." Chase argues that the "notwithstanding" clause precludes any consideration of other constitutional provisions, including the Gift Clauses. On the other hand, the provision authorizes economic development by describing "development and diversification of the economy" and related objectives as "public purposes" for which public money may be spent. This phrasing, the City and County urge, invokes the traditional Gift Clause analysis and speaks only to its "public purpose" element. They further caution that reading section 52-a to liberate economic-development deals from the pre-existing constitutional prohibition on gratuities or the requirement that adequate controls ensure the achievement of a public purpose would turn a provision designed merely to *authorize* economic-development expenditures into one that gives those expenditures special privilege above other uses of public funds.

Both positions enjoy some textual support, at least at first glance. As with any constitutional provision, however, we must read the text of section 52-a "not in a vacuum but also through the lenses of history and

9

precedent." *Borgelt*, 692 S.W.3d at 299. "When history indicates that the framers chose text that carried jurisprudential baggage beyond its plain meaning, we must understand both the text and the baggage in order to do our job . . . ." *Hogan v. SMU*, 688 S.W.3d 852, 858 (Tex. 2024). The admonition that "[w]e cannot understand constitutional provisions unless we understand their history" long pre-dates modern debates about methods of constitutional interpretation. *Henderson v. Beaton*, 52 Tex. 29, 42 (1879) (quoting THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 58 (Boston, Little, Brown & Co., 4th ed. 1878)). Now, as in the past, our goal when construing the Texas Constitution "is to understand the provision the way it would have been understood at the time of ratification, as best we can." *Hogan*, 688 S.W.3d at 858.[3] In that regard, "legislative construction and contemporaneous exposition of a constitutional provision is of substantial value in constitutional interpretation." *In re Abbott*, 628 S.W.3d 288, 293 (Tex. 2021) (citation modified) (quoting *Am. Indem. v. City of Austin*, 246 S.W. 1019, 1023 (Tex. 1922)).

We therefore look to the legal and historical context from which section 52-a arose, to legislative materials concerning the proposed amendment, as well as to contemporaneous materials describing the amendment to the voting public—all of which are useful in our effort to

---

[3] "The fundamental rule for the government of courts in the interpretation or construction of a Constitution is to give effect to the intent of the people who adopted it. The meaning of a Constitution is fixed when it is adopted; and it is not different at any subsequent time when a court has occasion to pass upon it." *Cox v. Robison*, 150 S.W. 1149, 1151 (Tex. 1912).

understand section 52-a's original meaning. As explained below, these sources lead us to agree with the City, the County, and the court of appeals that section 52-a establishes "development and diversification of the economy" as a legitimate public purpose but does not otherwise exempt economic-development spending from the traditional constitutional restrictions generally applicable to all uses of public funds in Texas.

**A.**

We begin with the legal background against which section 52-a was adopted. The amendment did not arise in isolation. It built on— and in key respects modified—a set of longstanding constitutional provisions that collectively bar the use of public resources for non-public ends. To understand what the ratifiers of section 52-a intended to permit, we must first consider what these earlier clauses were understood, at the time, to prohibit.

"Several 'Gift Clauses' of the Texas Constitution prohibit governmental entities from making 'gifts' of public resources to private parties." *Borgelt*, 692 S.W.3d at 293. Article III, sections 50, 51, and 52 together prohibit the legislature from granting—or authorizing others to grant—public money, credit, or other "thing[s] of value" to private persons or entities. Article XI, section 3 bars cities and counties from making "any appropriation or donation" to private corporations or associations. Article XVI, section 6 forbids "appropriation[s] for private or individual purposes." Though phrased differently, these clauses share a single aim: "the protection of the public funds and the public credit against misuse." *Bexar County v. Linden*, 220 S.W. 761, 761 (Tex.

11

1920).  Courts have long treated them as a cohesive body of law, *id.*, and modern cases continue to read them together, *see Borgelt*, 692 S.W.3d at 298–300; *In re State*, 711 S.W.3d 641, 646 (Tex. 2024).

As *Borgelt* recounts, the clauses arose in reaction to Reconstruction-era excesses, when cities and counties underwrote speculative railroad schemes and other ventures "in anticipation of benefits never realized."  692 S.W.3d at 299 (quoting *City of Cleburne v. Gulf, C. & S.F. Ry.*, 1 S.W. 342, 342 (Tex. 1886)).  Early cases read the Gift Clauses as relatively stringent restraints on public spending, describing their prohibitions as "absolute" and requiring that public expenditures serve "strictly governmental purposes."  *E.g.*, *Linden*, 220 S.W. at 762.  In *City of Cleburne*, for instance, the Court held that a city violated article XI, section 3 by purchasing a right of way and depot grounds for a railway company or refunding money already paid for that purpose.  1 S.W. at 343.[4]

Over time, the early cases' insistence that public expenditures serve only "strictly governmental purposes," *Linden*, 220 S.W. at 762, gave way to the perhaps broader formulation, "public purpose[s]," *Byrd v. City of Dallas*, 6 S.W.2d 738, 740 (Tex. [Comm'n Op.] 1928).  This shift in nomenclature accompanied a trend toward more permissive applications of the Gift Clauses.  In *Barrington v. Cokinos*, for example, this Court upheld on public-purpose grounds an arrangement

---

[4] As another example, a few decades later in *City of Tyler v. Texas Employers' Insurance Ass'n*, the commission of appeals concluded that a workers'-compensation law would contravene the Gift Clauses if it authorized payments for on-the-job injuries without municipal liability.  288 S.W. 409, 412 (Tex. Comm'n App. 1926, judgm't adopted).

reminiscent of the very railroad subsidies that originally animated the Gift Clauses. 338 S.W.2d 133, 145–46 (Tex. 1960). The City of Beaumont agreed to "furnish [the] right of way for relocation of part of [a] railroad line," even though the railroads could have been required to bear the cost. *Id.* The Court held that the grant was not an unconstitutional "donation" because it directly advanced public safety and convenience by eliminating sixteen grade crossings. *Id.* Other mid-twentieth-century cases reflected a broadening view of "public purposes" in other contexts. *See, e.g.*, *Davis v. City of Lubbock*, 326 S.W.2d 699, 709 (Tex. 1959) (upholding urban renewal as a public purpose); *State v. City of Austin*, 331 S.W.2d 737, 745–47 (Tex. 1960) (relocation of private utility facilities); *Bullock v. Calvert*, 480 S.W.2d 367, 369 (Tex. 1972) (funding party primaries).[5]

Even as the scope of permissible purposes shifted, the requirement of public control and the prohibition on gratuities remained consistent features of Gift Clause jurisprudence. In *Texas*

---

[5] This broader view of permissible purposes was reflected—and perhaps extended—in contemporary attorney general opinions, which local officials often sought before implementing new measures and which, in practice, seem to have informed the common understanding of what local governments could do with respect to public financing. *See, e.g.*, James G. Dickson, Jr., *Vital Crucible of the Law: Politics and Procedures of the Advisory Opinion Function of the Texas Attorney General*, 9 HOU. L. REV. 495, 528 (1972) (describing the contemporary role of attorney general opinions). Indeed, one Texas constitutional historian writing at the time observed that "the attorney general [was] principally responsible for taking the cited cases and drawing the new [public-purpose] rule from them." GEORGE D. BRADEN ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 234 (1977) (first citing Tex. Att'y Gen. LA-6, LA-9 (1973); and then citing Tex. Att'y Gen. Op. Nos. H-120 (1973), M-391 (1969), C-584 (1966), C-530 (1965)).

*Pharmaceutical Ass'n v. Dooley*, for example, the court invalidated a grant to a private corporation because it was not "subject to any control of the State Board of Pharmacy." 90 S.W.2d 328, 330 (Tex. App.—Austin 1936, no writ). And in *Gillham v. City of Dallas*, the court upheld a bond issue for private cold-storage facilities only "[s]o long as the City authorities supervise[d] and control[led] the contemplated buildings and the business conducted therein." 207 S.W.2d 978, 983 (Tex. App.—Dallas 1948, writ ref'd n.r.e.).

Courts likewise had long viewed consideration as an important way of distinguishing between a lawful exchange and a prohibited gift. As this Court held in the then-seminal Gift Clause case, *Linden*, "If . . . the effect of the statute is to bestow funds of the State upon [an entity] as a gratuity . . . it would be invalid." 220 S.W. at 762. Thus, "a pure gift or donation"—a grant or payment not supported by "legal consideration"—plainly violates the Gift Clauses. *Tompkins v. Williams*, 62 S.W.2d 70, 71 (Tex. Comm'n App. 1933, judgm't approved). On the other hand, "[i]t is not the granting of a gratuity for the county to grant a privilege for which it receives substantially the value thereof in return." *Dodson v. Marshall*, 118 S.W.2d 621, 624 (Tex. App.—Waco 1938, writ dism'd).

Thus, there remained a settled understanding in the years preceding section 52-a's ratification—even as prevailing conceptions of permissible "public purpose" evolved—that any public expenditures in connection with private enterprise must "include[] sufficient controls to assure that the public purpose would actually be served" and provide "assurance that the contracting governmental entity would receive

14

adequate consideration or benefit for the services provided to private parties." *E.g.*, Tex. Att'y Gen. Op. No. H-1010, 2 (1977).

Although the scope of permissible public purposes seems to have expanded over time, it was typically not thought to include expenditures for pure economic development. The Court wrote in *Barrington* that while the Gift Clauses do not prohibit "business dealings with private corporations and associations" so long as a public purpose is directly accomplished, public funds still "may not be used simply to obtain for the community and its citizens the general benefits resulting from the operation of such an enterprise." 338 S.W.2d at 140.

*Barrington*'s conception of public purpose had the effect of frustrating various economic-development proposals in the years leading up to section 52-a's enactment. In 1973, the attorney general declined to approve industrial-development revenue bonds by the City of McAllen to fund the purchase of land for commercial development. *See* BRADEN, *supra*, at 234 (discussing this episode); *see also City of McAllen v. Hill*, No. B-4315, 17 Tex. Sup. Ct. J. 128 (Dec. 19, 1973) (mandamus relief denied without opinion). The next year, the Texas Industrial Commission asked for an attorney general opinion on whether "a city may purchase property to be used by private industry by giving a note to be repaid out of the revenues generated by the property." Tex. Att'y Gen. Op. No. H-357, 1 (1974). The attorney general concluded that "it is not considered a public purpose within this legal context[] when municipal credit is used to obtain for the community and its citizens the general benefits resulting from the operation of a private industry." *Id.* at 5 (citing *Barrington*, 338 S.W.2d at 140). Also in 1974,

15

a county's proposal to fund its local chamber of commerce for the purpose of "promoting industrial development in the county" was disapproved by the attorney general, who called the proposal an impermissible "attempt to secure for the community and its citizens by subscription to a private corporation general benefits resulting from encouragement of private industry and business." Tex. Att'y Gen. Op. No. H-397, 1–2 (1974) (citing *Barrington*, 338 S.W.2d at 140).

Thus, in the years leading up to section 52-a's adoption, it was "generally conceded in Texas that 'pure' industrial development bonds of the type involved in *McAllen vs. Hill* [were] not permissible." Mike Willatt, *Constitutional Restrictions on Use of Public Money and Public Credit*, 38 TEX. B.J. 413, 417 (1975). Nevertheless, the precise contours of the "public purpose" requirement remained shifting and elusive, prompting a 1984 attorney general opinion to observe—regrettably, but not without foundation—that "[n]o fixed rule delineates exactly what constitutes a public purpose." Tex. Att'y Gen. Op. No. JM-220, 4 (1984).

**B.**

Against this legal background, the primary historical impetus for section 52-a was the 1980s oil bust. Crude prices dropped from $35 a barrel in 1981 to around $10 by 1986. *See* M. RAY PERRYMAN, SURVIVE AND CONQUER: TEXAS IN THE '80S, at 40–41, 82, 106–11 (1990). A Texas economy heavily dependent on oil suffered widespread layoffs, business failures, and sharp drops in state and local revenues. *Id.* In the wake of the bust, "economic development" soon became "the 'buzz word' in legislative and business circles across Texas." Amy Kems, *Diversification Called Key to State Problems*, BAYTOWN SUN, Oct. 16,

1987, at 1-A.[6] As the 70th Legislature prepared to convene in 1987, the question was not whether it should do something about economic development, but what it would do.

Before the 1987 legislative session began, House Speaker Gib Lewis created an "Economic Advisory Group" to "suggest ways to revitalize the state's economy." *See* Jack Keever, *Speaker Lewis Announces Economic Advisory Panel*, KERRVILLE DAILY TIMES, May 30, 1986, at 5-A. The resulting report called for state-sponsored efforts to "create research parks, assemble venture capital, facilitate the creation of business incubators, and the like." ECON. ADVISORY GRP., ALTERNATIVES FOR REVITALIZING AND DIVERSIFYING THE ECONOMY OF TEXAS 5 (1987).

The report identified an obstacle: constitutional uncertainty over using public funds to support private enterprise. *Id.* at 23. It noted that "[m]any of [its] proposed recommendations . . . call[ed] for the use of public funds for loans, grants, and other types of assistance to private entities." *Id.* But there was "uncertainty with respect to the constitutionality of the Texas Legislature providing direct grants and loans to accomplish the purpose of economic diversification." *Id.* "The best legal position," the report concluded, "is that public moneys can be used for a program as long as the legislature is accomplishing a public purpose." *Id.* But "[t]he problem with this is that the determination of

---

[6] Not everyone was sold on the idea: "The wise watcher of public affairs will keep eyes and ears open for the next seven months for what is done in the name of the newest Texas buzzword—'economic development.'" Sam Kinch, Jr., *Beware of 'Economic Development' Promises*, LAKE TRAVIS VIEW, Nov. 5, 1986, at 4.

17

public purpose is subject to review by the Attorney General or the courts to determine whether the legislature or the political subdivisions have abused their discretion in determining that a public purpose will be accomplished." *Id.*

The report continued: "In an effort to eliminate this confusion and uncertainty, the Advisory Group recommends that there be a Constitutional Amendment [that] would clearly authorize the legislature to make grants and loans for a wider range of projects [that] would stimulate economic diversification and encourage employment." *Id.* This recommendation, it appears, was the genesis of section 52-a.[7] House Joint Resolution 5 proposed a constitutional amendment "authorizing the legislature to provide for loans and grants of public money related to state economic development." Act of May 20, 1987, 70th Leg., R.S., 1987 Tex. Gen. Laws 4122 (Tex. H.J. Res. 5) (filed Feb. 6, 1987). The resolution proposed the text of section 52-a substantially as adopted. *Id.*

Testimony at public hearings emphasized that the amendment was needed to remove uncertainty in determinations of public purpose, particularly as to the economic-development legislation then being proposed. Representative Ashley Smith, the amendment's sponsor, urged that proponents of these efforts did not "want to continue to have

---

[7] *See* Hearings on H.J. Res. 5 Before the House Comm. on Sci. & Tech., 70th Leg., R.S. (Mar. 3, 1987) [hereinafter Committee Hearing] (statement of Jerry Turner) (tape available from the House Video/Audio Servs. Off.) (Side A - 14:38–14:48) ("I suppose I should mention that the recommendation for this legislation [proposing section 52-a] grew out of the Speaker's task force on economic development.").

to go back to the courts to ask for an interpretation of what public purpose is, nor . . . to go back each time to the attorney general and ask for a determination of public purpose." Committee Hearing (8:15–8:26). The proposed constitutional amendment, Smith explained, would thus "clarify the specific applications under this series of bills . . . [and] give definition to the public purpose." *Id.* (8:45–8:58).

The theme of resolving uncertainty about what constitutes a public purpose carried through as the proposal moved to the House and Senate floors. In both chambers, the measure was presented not as a break with the Gift Clauses but as a clarification, intended to remove lingering constitutional doubts and to affirm that programs promoting economic diversification could rest securely on a declared public purpose.[8]

Several official bill analyses reinforced this understanding. One warned that Texas would "have difficulty in implementing these models of financing for economic development . . . until constitutional language that clarifies economic development as a public purpose is adopted." House Comm. on Sci. & Tech., Bill Analysis, Tex. H.J. Res. 5, 70th Leg., R.S. 1 (1987). Another observed that "the courts have generally interpreted existing constitutional provisions to permit grants for public purposes" and that, "[s]ince the product development fund and the small business incubator fund are intended to benefit the public by fostering economic growth and diversity, this proposed change is in the spirit of

---

[8] Debate on H.J. Res. 5 on the Floor of the House, 70th Leg., R.S. (Apr. 7, 1987) (tape available from the House Video/Audio Servs. Off.) (24:49–25:02); Debate on H.J. Res. 5 on the Floor of the Senate, 70th Leg., R.S. (May 14, 1987) (tape available from the Tex. State Libr. & Archives Comm'n) (6:00–6:20).

the current provisions." House Rsch. Org., Bill Analysis, Tex. H.J. Res. 5, 70th Leg., R.S. 2 (1987). Yet because uncertainty persisted, "it would be prudent to clarify that public loans and grants for economic development . . . are indeed for public purposes and constitutionally acceptable." *Id.* Another analysis chalked the need for the amendment up to the attorney general's historical view that "a grant for the purpose of obtaining the general benefits resulting from the operation of a private industry is not for a public purpose."[9]

The legislative record thus reveals a consistent theme. At each stage of section 52-a's progress toward passage, lawmakers accepted that the Gift Clauses barred the use of public funds for private ends but recognized that existing interpretations had cast doubt on whether assistance to private enterprise could ever serve a public purpose. Section 52-a resolved that tension. It clarified that programs promoting economic diversification, employment, agriculture, and industrial development would qualify as serving a public purpose even when the immediate recipients were private entities.

## C.

By the time section 52-a reached the ballot in November 1987, it was one of a "record 25 proposed constitutional amendments plus two

---

[9] LEGIS. COUNCIL, ANALYSES OF PROPOSED CONSTITUTIONAL AMENDMENTS AND REFERENDA APPEARING ON THE NOVEMBER 3, 1987, BALLOT 14 (1987) (citing Tex. Att'y Gen. Op. No. H-357 (1974)).

20

referenda"—the longest constitutional ballot in Texas history.[10] Amid the clutter, Proposition 4—the measure proposing section 52-a—received comparatively little attention, overshadowed by other proposals (like whether to permit racetrack betting).[11] What descriptions there were of the amendment tended to be fairly generic: "To provide public monies to private companies encouraging development."[12]

The amendment was often presented as part of a package of "Build Texas" amendments comprising constitutional authorization for toll-road expansion, business and agricultural development funds, tax exemptions, public-works financing, and $500 million to attract a federal supercollider project.[13] What little focused attention the amendment received in the press was generally consistent with the view

---

[10] *Too Many Questions on November Ballot*, AMARILLO SUNDAY NEWS-GLOBE, Aug. 16, 1987 (emphasis omitted) (clip on file with the Legis. Reference Libr.).

[11] *See* Bruce Hight, *Texas Voters Must Tackle Amendments*, AUS. AM.-STATESMAN, July 23, 1987 (clip on file with the Legis. Reference Libr.) ("The issue that probably will attract the most voter attention is whether to permit pari-mutuel betting on horse races."); Kenneth F. Bunting, *Voting May Seem More Like 20 Questions*, FT. WOR. STAR-TELEGRAM, Oct. 18, 1987 (clip on file with the Legis. Reference Libr.) ("[B]ecause the spotlight seems to be trained on racing, advocates of other propositions are scrambling to focus attention on their causes.").

[12] *Texas Voter's Guide*, HONDO ANVIL HERALD, Oct. 29, 1987, at 13B; *see also, e.g.*, *Enterprise Recaps Lengthy Ballot List*, BEAUMONT ENTER., Oct. 31, 1987 (clip on file with the Legis. Reference Libr.) ("Amendment 4, which would allow public loans and grants for economic development.").

[13] *See, e.g.*, *Build Texas Package Deserves Voters' OK*, BEAUMONT ENTER., Oct. 28, 1987 (clip on file with the Legis. Reference Libr.) (describing the Build Texas package and listing Proposition 4).

that it was thought to clarify what counts as a public purpose. The Texas Research League explained to voters that "the courts have interpreted [the Gift Clauses] to permit grants or loans as long as they are deemed to be for 'public purposes.'" *A Constitutional Heritage Left by the Carpetbaggers: The 1987 Constitutional Amendments*, Tex. Rsch. League, Sep.–Oct. 1987, at 5. "However, the general principles used to determine what constitutes a 'public purpose' often leave doubt in any given case." *Id.* "Thus, some feel that specific constitutional authority is needed to prevent challenges to various economic programs that might be undertaken and funded by the state and/or local governments." *Id.*

Likewise, an editorial-board endorsement noted that the amendment "would clarify that public loans and grants for economic development . . . are for public purposes and constitutionally acceptable." *Amendment 4*, KERRVILLE DAILY TIMES, Oct. 20, 1987, at 4. Others explained that the amendment was necessary because, "in order to use state money or credit for anything other than strictly public purposes, a separate constitutional exception must be made."[14]

The ballot language rather vaguely asked voters to approve "[t]he constitutional amendment authorizing the legislature to provide assistance to encourage economic development in the state." *Sample*

---

[14] Sam Kinch, Jr., *A Quiet, But Radical, Shift*, DALL. MORNING NEWS, Aug. 7, 1987 (clip on file with the Legis. Reference Libr.); *see also Voters Guide: Constitutional Amendment Election November 3, 1987*, TULIA HERALD, Oct. 22, 1987, at 24 ("It would clarify that loans and grants for public purposes such as the Product Development Fund, the Small Business Incubator Fund, and the Agricultural Fund included in proposed Amendment 6 are constitutionally acceptable and would prevent any delay or confusion . . . .").

*Ballot*, POLK CNTY. ENTER., Nov. 1, 1987. In the end, Proposition 4 passed narrowly, with 51.7% of the vote, although half of the measures in the "Build Texas" package failed. *See Final Vote Totals*, TULIA HERALD, Nov. 12, 1987, at 5.

**D.**

The legal and historical background preceding section 52-a, as well as the contemporaneous debate and commentary surrounding its enactment, together demonstrate that section 52-a was thought, at the time, to resolve a discrete legal problem: uncertainty over whether governments were pursuing a permissible public purpose when they spent public money to promote private economic growth. The amendment resolved that uncertainty by expressly describing "development and diversification of the economy of the state" and related goals as "public purposes." Nothing suggests that anyone thought they were approving gratuitous payments to private companies, dispensing with the need for controls sufficient to ensure the achievement of a public purpose, or otherwise affording special status to economic-development spending not enjoyed by any other category of government spending under longstanding Gift Clause precedent.

The principal effect of section 52-a, instead, was this: There may no longer be any judicial second-guessing that "development and diversification of the economy" is a valid public purpose for which governments in Texas may spend public funds. In other words, unlike before section 52-a, governments may now use public funds for the public purpose of obtaining "the general benefits resulting from the operation" of private enterprise. *Contra Barrington*, 338 S.W.2d at 140.

23

The long-recognized, separate requirements of control and consideration—applicable to all government spending, not just to economic development—remain the means by which courts and taxpayers can distinguish a valid economic-development grant from an unconstitutional give-away. Continuing to require control and consideration under the Gift Clauses does not undermine or conflict with section 52-a's authorization of economic-development spending. It instead ensures that expenditures labeled "economic development" are genuinely made in pursuit of, and designed to actually achieve, their ostensible public purpose. Our constitution, after all, "must be obeyed in reality, not just in form." *Borgelt*, 692 S.W.3d at 310. And "it is easy to adorn an otherwise-illegal transfer to a private recipient with a mere bauble of public purpose." *Id.* at 304.

This approach remains faithful to section 52-a's text and our precedent. Section 52-a allows the legislature to authorize the use of "public money . . . for the public purposes of development and diversification of the economy of the state." TEX. CONST. art. III, § 52-a. By 1987, whether a grant of public funds accomplished a "public purpose" had become one of the three key components of the Gift Clause test. *See supra* II.A–C; s*ee also TML*, 74 S.W.3d at 383–84; *Borgelt*, 692 S.W.3d at 301. And while ordinarily "we presume that the Legislature acted with knowledge of [the] background law and with reference to it," *In re Facebook, Inc.*, 625 S.W.3d 80, 97 (Tex. 2021) (citation modified), in this case no presumption is needed. Those who proposed section 52-a said so plainly. They cast the amendment as a clarification within the existing Gift Clause framework, designed to dispel uncertainty about

24

what constituted a public purpose, not to discard the parallel requirements of consideration and control. Put simply,

> there is no language in either section 52-a or in the relevant commentary to suggest that the amendment was intended to change the requirements that public resources and powers be used for "the direct accomplishment of a public purpose" and that transactions using such resources and powers contain sufficient controls "to [e]nsure that the public purpose be carried out."

Tex. Att'y Gen. Op. No. JM-1255, 8–9 (1990) (quoting Tex. Att'y Gen. Op. No. JM-1229, 6 (1990)). We therefore hold that section 52-a establishes "development and diversification of the economy" as a legitimate public purpose but does not otherwise supplant the traditional Gift Clause scrutiny that has long been applicable to government spending in Texas.

## III.

With that understanding in mind, we turn to the facts of this case to determine whether the economic-development arrangement in question satisfies section 52-a and the Gift Clauses. We conclude that it likely does, which means that summary judgment for the City and County was improper.

## A.

The first question under section 52-a is whether the payments at issue were "for" the "public purposes of development and diversification of the economy." TEX. CONST. art. III, § 52-a. If the payments were "for" those purposes, as they would have been understood in 1987, then the constitutional inquiry on this point is complete. To answer that

question, we look not to present-day policy preferences but to the understanding of economic development and diversification that prevailed when section 52-a was adopted, and to the kinds of arrangements that the amendment was intended to bring within constitutional bounds.

We need not explore the outer bounds of what expenditures may be "for the public purposes of development and diversification of the economy." Even under a restrained view, the arrangement here—an agreement by which local governments dedicated portions of the tax revenue associated with a construction project and its related commercial area in order to attract new businesses and create jobs in the area—comfortably falls within that category. The history of section 52-a makes clear that this is precisely the kind of "conventional economic-development grant[]" that the framers of the amendment intended to authorize. *In re State*, 711 S.W.3d at 647.

As discussed above, prior to section 52-a, courts generally took a dim view of claims that economic-development spending advanced a public purpose. *See, e.g.*, *Barrington*, 338 S.W.2d at 140. Thus, an arrangement much like the one here, in which a city financed a private facility with debt tied to the project's future revenues, was considered an unconstitutional "attempt to secure for the community and its citizens the general benefits resulting from encouragement of private industry." Tex. Att'y Gen. Op. No. H-357, 5 (1974).

Section 52-a was adopted to change that result. Indeed, the official bill analysis traced the need for section 52-a to Attorney General Opinion No. H-357, which disapproved a city's use of revenue-backed

26

financing to acquire land for lease to private industry, with repayment tied to revenues generated by the project. *See* LEGIS. COUNCIL, *supra*, at 14. The conclusion of Opinion No. H-357 could almost have been written in response to a request for advice on the very project at issue in this case:

> It is not constitutionally permissible for a city to purchase land for future industrial development by means of a promissory note to be paid out of revenues generated by the land without recourse to the city when the benefit to the public from such a purchase is such benefit as may be derived from the attraction of new industry.

Tex. Att'y Gen. Op. No. H-357, 5 (1974).

There is therefore no doubt that those who adopted section 52-a would have understood revenue-backed financing of the kind at issue here as among the valid means of pursuing the newly declared public purpose of economic development. As in the programs that prompted Attorney General Opinion No. H-357 and the adoption of section 52-a, the City and County committed a defined share of future public revenues associated with the new development to service debt incurred to pay for property that a private enterprise would occupy and operate. The pledged tax revenues and rental income were dedicated to repaying the loan, while the governments retained no ownership or operational role in the facility but expected that their participation would stimulate commerce, employment, and tax growth in the surrounding area. This structure fits comfortably within the type of activity the 1987 amendment was plainly designed to allow. *Cf. id.* at 1–5. The expenditures at issue were thus "for" the "public purposes of

27

development and diversification of the economy" as those words would have been understood in 1987. TEX. CONST. art. III, § 52-a.

**B.**

The court of appeals approached the question of public purpose by identifying the particular economic activity the deal sought to bring about and then asking whether the deal continued to generate that specific activity and contained controls to ensure it would do so. The court identified the deal's public purpose as the operation of the Gander Mountain store, a purpose that of course vanished when the store closed. 685 S.W.3d at 181–83. The district court took a similar view, declaring that "the closing of the Gander Mountain store extinguished the public purposes [that] authorized the City's and County's grants of public money."

This approach misapprehended the constitutional inquiry. The relevant question is not whether the specific economic activity envisioned by the parties has been accomplished and sustained. The question, instead, is whether the arrangement genuinely serves the purpose of economic development, which the people of Texas have declared to be public and valid—and whether it contains controls adequate to ensure economic development actually takes place.

A tenant-specific approach to the constitutional question lacks grounding in the constitutional text and would generate curious results. Consider a city that agrees to subsidize the construction of a private commercial facility on the premise that it will attract visitors, create jobs, and generate tax revenue. Suppose the original business later closes, and another company steps in to run a similar enterprise,

28

producing the same or greater public benefits. But the city refuses to continue the subsidy because the new owner lacks the original operator's political ties. Could the city set up the Gift Clauses as a defense to continued payments on the theory that the purpose of the incentives was beneficiary-specific? Surely not. That scenario illustrates the very cronyism the Gift Clauses exist to prevent.

Next, suppose the economic-development agreement says that the subsidy is "for the operation of the XYZ Retail Store." Years later, that store closes and a new retailer opens in the same building, generating the same economic activity, jobs, and tax revenue that justified the public investment in the first place. Does the *constitution* obligate the city to cease payments—even though the expenditures continue to be "for" the "public purposes of development and diversification of the economy of the state"—because the original contract was specific to a particular retailer? Again, surely not. Contractual purpose is not coterminous with constitutional purpose. *Cf. Borgelt*, 692 S.W.3d at 308 ("[A] *breach* of contract is not necessarily evidence that the *contract is itself* unconstitutional. . . . Not all contractual violations (indeed, very few) are of *constitutional* significance." (footnote omitted)). The government is free to use contracts to restrict the scope of what it is permitted to pay for, but it cannot use contracts to restrict the scope of what the constitution will permit it to pay for.

The lower courts' singular focus on the lifespan of the Gander Mountain store was therefore misplaced. The constitutional question is not whether a particular tenant—or any other particular economic activity envisioned at the outset of the deal—remains in place. The

29

question is whether the expenditures by the City and County genuinely serve the public purpose of economic development in some concrete and actual way—even if it is not in precisely the way the parties initially envisioned. A deal that is genuinely designed to promote economic development, and actually does so, does not cease to be constitutional merely because the economic benefits it generates down the road are not the same ones the parties initially envisioned. In other words, the continued operation of a Gander Mountain store would have been one way for the deal's proponents to demonstrate that their arrangement actually promoted economic development. But it was not the only way.

Chase contends that the disputed grants were designed to—and actually did—facilitate not just an eleven-year tenancy by Gander Mountain but also the development of a shopping district that has generated considerable economic activity and tax revenue both during and after Gander Mountain's departure. That appears to be the case, based on the limited record before us. In any event, summary judgment for the City and County premised on the closure of the Gander Mountain store was improper and must be reversed.

## C.

An overly narrow conception of the deal's public purpose also infected the lower courts' analysis of controls. Because they treated the Gander Mountain store itself as the only constitutionally relevant objective, the lower courts asked whether the contracts contained sufficient controls to ensure the store's continuing operation. The answer, of course, was no—there is no longer a Gander Mountain store in Corsicana. On that mistaken premise—that the sole public purpose

30

was the continued operation of a single store—the courts concluded that the agreements lacked sufficient controls to ensure the accomplishment of a public purpose. Properly considered, however, these agreements likely contained sufficient safeguards to satisfy the constitutional requirement that the government "retain public control over the funds to ensure that the public purpose [of economic development] is accomplished and to protect the public's investment." *TML*, 74 S.W.3d at 384.

Three features of the arrangement inform that conclusion. First, the interlocal agreement provided that payments would only begin "following the completion and opening of Gander Mountain." In other words, public funds would not be spent until the initial economic-development goal—attracting an anchor store for the new shopping district—was achieved. That "pay-for-performance" design is a useful control: it prevents "no-strings-attached" payments, ties disbursements to a defined economic deliverable, and ensures that public funds are not advanced for speculative private uses that may not actually turn out to serve public purposes. All of these, we have held, are core aims of the Gift Clauses. *See Borgelt*, 692 S.W.3d at 308–10; *In re State*, 711 S.W.3d at 646–47.[15]

---

[15] Indeed, speculative cash advances on construction projects were one of the very evils that gave rise to the Gift Clauses. *See* DEBATES IN THE TEXAS CONSTITUTIONAL CONVENTION OF 1875, at 116, 131–32 (Seth Shepard McKay ed., 1930); SETH SHEPARD MCKAY, SEVEN DECADES OF THE TEXAS CONSTITUTION OF 1876, at 110 (1942) ("The extravagant abuse of [cash grants to railways] by the radical Davis administration, which increased the bonded debt of the state by several million dollars, caused the people to amend the constitution in 1874 by forbidding money subsidies . . . .").

Second, the agreements required that the City's and County's contributions be held in a separate account to be used "solely" to pay off the debt from the construction project. The funds in the account could "not be used for any other purpose." That structure prevented public funds from being spent on unrelated private ventures. As *Borgelt* explained, restrictions that confine the use of funds to specified, authorized purposes are a recognized means of retaining public control and ensuring that the public purpose is accomplished. 692 S.W.3d at 309–10; *see also Jefferson County v. Bd. of Cnty. & Dist. Rd. Indebtedness*, 182 S.W.2d 908, 913 (Tex. 1944) ("[T]hese funds are not granted to such counties for unrestricted use by them. Such funds can be used only for the purpose of constructing public roads . . . .").

Third, the agreements tied the governments' financial obligations to the economic activity generated by the project by pegging the amount of each payment to a percentage of sales-tax revenue generated within the shopping district. Public funds were not granted in fixed amounts or lump sums; they moved in direct proportion to the success of the project's economic goals. This structure conditioned the flow of public money on whether or not economic activity and development was actually happening as promised, thereby closely aligning the public expenditures with their constitutionally permitted purpose.

These features of the deal, taken together, tend to demonstrate sufficient "public control over the funds to ensure that the public purpose [of economic development] is accomplished and to protect the public's investment." *TML*, 74 S.W.3d at 384. Summary judgment for

the City and County on the question of adequate controls was therefore improper.

## D.

The final requirement is that the government receive a return benefit in exchange for its expenditures. *Borgelt*, 692 S.W.3d at 301–02; *TML*, 74 S.W.3d at 384–85. The record reflects that the City and County received such a benefit. No one disputes that a large retail store capable of anchoring the new shopping district was built. Nor does anyone dispute that the funds in the Grant Fund were used solely in relation to the debt incurred from that construction and were not "subverted to private purposes." *Borgelt*, 692 S.W.3d at 310. The Gander Mountain facility was built and operated for more than a decade, anchoring a shopping district that apparently has generated and continues to generate jobs, commerce, and additional tax revenue. That the original tenant later closed does not erase the consideration the governments received. And although the record on this point is somewhat murky, it suggests that the sales-tax contributions owed by the City and County would have continued in roughly the same amounts (around $150,000 per quarter) even after Gander Mountain closed—indicating that new development spurred by public investment had, over time, begun contributing to sales-tax revenue. This is in line with an uncontroverted affidavit stating that "Gander Mountain contributed to the success of the center for more than a decade," such that "Corsicana Crossing may not have materialized without Gander Mountain." Finally, no one disputes that the former Gander Mountain facility is now occupied by another large retailer, Fun Town RV.

Although the record is not entirely clear on the point, construction of the Gander Mountain facility seems largely to have achieved its intended purpose by attracting additional tenants and substantially increasing economic activity and sales-tax revenue in the shopping district. If true, this public benefit was easily sufficient consideration for Gift Clause purposes. By declaring that the "development and diversification of the economy" is a valid public purpose, the people of Texas took the view that fostering private enterprise can, when properly structured, generate real public value in return. That declaration would ring hollow if courts assessing the constitutionality of such programs were to disregard or restrictively construe the economic benefits such programs yield. The people of Texas decided, in amending their constitution, that public expenditures for economic development serve a genuine public purpose. To the extent there is lingering judicial skepticism of the wisdom of the people's judgment in that regard, it must play no role in the courts' approach to these questions.

Thus, even though economic-development programs remain subject to the Gift Clauses' other requirements, courts should resist reading those safeguards so broadly that they prohibit the very core of the activity section 52-a was adopted to permit. The Gift Clauses still serve their essential role—to prevent gratuities and ensure accountability—but they ought not be stretched so far as to prohibit what the people themselves have declared to be a public purpose. On the record before us, the evidence suggests that the governments' investment produced the very kind of public benefit section 52-a was designed to achieve.

34

## IV.

For these reasons, summary judgment for the City and County was improper. The courts below erred in concluding that the closure of a particular store extinguished the constitutional purpose supporting the economic-development agreements and in holding the agreements unconstitutional on that basis.

The viability of the local governments' Gift Clause claims largely hinges on their effort to narrowly define the deal's public purpose as the continued operation of the Gander Mountain store. That theory having failed, it appears based on the available record that neither section 52-a nor the Gift Clauses prohibits the City or County from honoring its agreement to continue making payments under the deal it struck, which apparently has generated and continues to generate economic development in the local area.

While the materials before us support this conclusion, the record remains unclear and underdeveloped as to various matters, including the development of new businesses in the shopping district over the years, as well as alleged construction defects or other irregularities in the project's execution that have been alleged by the City and County. Those and potentially other factual questions may, if necessary, be further explored on remand, which is the disposition requested by Chase.

The judgment of the court of appeals is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

                                                                   _____

James D. Blacklock
Chief Justice

**OPINION DELIVERED:** May 8, 2026